Shirley **WILDER, Thomas Edwards, and Sharon Rodwell, et al., Plaintiffs,**

v.

Blanche **BERNSTEIN, individually and as Administrator of the New York City Human Resources Administration, et al., Defendants,**

**and**

Abbott House, et al., Intervenors.

No. 78 Civ. 957 (RJW).

United States District Court, S.D. New York.

Oct. 8, 1986.

American Civil Liberties Union Foundation Children's Rights Project, New York City, for plaintiffs; Marcia Robinson Lowry, Lauren C. Anderson, Christopher A. Hansen, Michael B. Mushlin, of counsel.

Law Dept. of the City of New York, Office of the Corp. Counsel, New York City, for defendants Bernstein, New York City, Sanders, Parry, Beine, Marino and Goldin; Frederick A.O. Schwarz, Jr., Corp. Counsel, Diane J. Morgenroth, Michele M. Ovesey, Gary P. Shaffer, Asst. Corp. Counsel.

Dept. of Law of the State of N.Y., Office of the Atty. Gen., New York City, for defendants Blum and Levitt.

Robert Abrams, Atty. Gen., R. Scott Greathead, First Asst. Atty. Gen., Judith T. Kramer, Asst. Atty. Gen., Davis Polk & Wardwell, New York City, for defendants Howard, Mary Francene, Sheila, Apers, O'Neill, White, McCormack, Breen, Foley, Chillion, McNaughton, Mary James, Mary Chrysostom, Fogarty, Wallace, Fontaine, McMahon, Mary Patrick, Mary Sheila, Trager, Meaney, Mary Olivia, Harris and Altheimer; Richard E. Nolan, Thomas J. Aquilino, Jr., Whitney L. Schmidt, Karoly S. Gutman, of counsel.

Bodell & Gross, New York City, for defendants Rabinow, DeMartino, Levine, Trobe, Schneider, Barry, Sheridan, Marita Paul, Starace and Quinn; Gerald E. Bodell, Helen McTaggart, of counsel.

Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for defendant Goldsmith; Michael N. Rosen, Floran L. Fink, Maxine Fass, Andrew Irving, of counsel.

Ohrenstein & Brown, New York City, for defendant Kaufman; Mark J. Bunim, Ivy S. Fischer, of counsel.

Webster & Sheffield, and Polier, Tulin, Clark & Zalk, New York City, for intervenors; Donald J. Cohn, Stephen Wise Tulin, Tracy E. Miller, Seth M. Lahn, of counsel.

## OPINION AND ORDER

ROBERT J. WARD, District Judge.

This civil action, for declaratory and injunctive relief under 42 U.S.C. §§ 1983, 1985 and 1986, and 28 U.S.C. §§ 2201 and 2202, is brought on behalf of a certified class of black Protestant[1] children in need of child care services out of their home, and on behalf of several New York taxpayers. Plaintiffs challenge New York's statutory scheme for the provision of child care services, and the operation of the New York City child care system, on the grounds that the statutes and operation of the New York City system violate the Establishment and Free Exercise Clauses of the First Amendment, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Jurisdiction is alleged under 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4), and 42 U.S.C. § 2000d. Plaintiffs, defendant New York City ("City") and individual defendants currently employed by the City (collectively, "City defendants"), defendant Kaufman, and eighteen intervening child care agencies ("intervenors")[2] move for an order pursuant to Rule 23(e), Fed.R.Civ.P., approving a proposed stipulation of settlement ("Stipulation") that was presented to the Court on December 19, 1985. For the reasons that follow, and subject to certain conditions set forth below, the motion is granted and the Stipulation is approved.

## BACKGROUND

This litigation, which originated in a lawsuit filed in June 1973, *Wilder v. Sugarman*, 73 Civ. 2644(HRT) (S.D.N.Y.), has in the course of its development over the past thirteen years assumed very much a life of its own. The official documents filed in the instant case alone—mostly relating to discovery—number over 750. The intersecting constitutional, statutory and child care issues raised in the action have provoked commentary in legal publications, *e.g.*, Note, *With the Best of Intentions: The Constitutionality of the Statutory Scheme for Voluntary Child-Care Agencies in New York*, 4 N.Y.U.Rev.L. & Soc. Change 21 (1974), independent study by researchers in the fields of child care and public services, *e.g.*, S. Finch & D. Young, *Foster Care and Non-Profit Agencies* (Lexington Books 1977); D. Gurak, D. Smith & M. Goldson, *The Minority Foster Child: A Comparative Study of Hispanic, Black and White Children* (Hispanic Research Center, Fordham University, Monograph No. 9, 1982) ("*The Minority Foster Child*"), and review by government officials or advisory bodies, *e.g.*, *Redirecting Foster Care* (Report of Mayor's Task Force on Foster Care, issued June 1980).[3] Much of the relevant history of this litigation is chronicled in previously published decisions, chiefly *Wilder v. Sugarman*, 385 F.Supp. 1013 (S.D.N.Y.1974) (three-judge court) ("*Wilder I*"), and *Wilder v. Bernstein*, 499 F.Supp. 980 (S.D.N.Y.1980) ("*Wilder II*"), familiarity with which is assumed. A selective review of the case's history is helpful, however, to an understanding of its present posture.

### I. *Wilder I*

The complaint filed in June 1973 and assigned to Judge Tyler of this Court, *Wilder v. Sugarman*, 73 Civ. 2644(HRT) (S.D.N.Y.), raised constitutional challenges to the New York child care system similar to those still before this Court in the instant action. Judge Tyler referred the case on plaintiffs' motion to a three-judge court convened pursuant to 28 U.S.C. §§ 2281 and 2283. In June 1974, the three-judge

---

**1.** For purposes of this Opinion, the term "Protestant" refers to children who are neither Catholic nor Jewish.

**2.** All intervening child care agencies with the exception of the Puerto Rican Family Association have signed the Stipulation. In addition, the Leake & Watts Children's Home, Inc., a nonparty agency, has also signed the Stipulation.

**3.** From interviewing candidates for judicial clerkships in recent years, it has come to the Court's attention that *Wilder* also has provided at least one law school professor with the material for a "hypothetical" examination question.

panel entered a pretrial order identifying the issue before it as:

[w]hether New York Social Services Law § 373(1), (2) and (5), New York State Constitution Article 6, § 32, Family Court Act § 116(a), New York Social Services Law § 153 and New York Constitution Article 7, § 8(2) violate the Establishment Clause of the First Amendment to the Constitution of the United States on their face....

Thereafter, the panel filed an opinion, *Wilder I*, addressing "the facial constitutionality of the New York State constitutional and statutory provisions regarding religious matching for publicly-funded foster care of children." 385 F.Supp. at 1018. The opinion expressly disclaimed consideration of "any aspect of the application of these provisions in specific instances." *Id.*

The three-judge court in *Wilder I* reviewed the existing statutory scheme in New York for placing children in care outside of the home, in light of the historical development of the state's child welfare system and the longstanding participation in it by religiously affiliated child care institutions. The panel noted in particular the following provisions of the New York Constitution and statutes:

The system has its modern genesis in Article VI, § 32 of the New York Constitution, which provides that a child "shall be committed or remanded or placed, when practicable, in an institution or agency governed by persons, or in the custody of a person, of the same religious persuasion as the child." This constitutional provision is implemented by § 373 of the New York Social Services Law, ... which states in pertinent part:

"1. Whenever a child is committed to any agency, association, corporation, institution or society, other than an institution supported and controlled by the state or a subdivision thereof, such commitment shall be made, when practicable, to an authorized agency under the control of persons of the same religious faith as that of the child."

Amendments to § 373 of the New York Social Services Law and § 116 of the New York Family Court Act supplement the religious matching provision by specifying that the provisions of those sections "shall, so far as consistent with the best interests of the child, and where practicable, be applied so as to give effect to the religious wishes of the [parents]." New York Social Services Law § 373(7); New York Family Court Act § 116(g).

With respect to public payment of the expenses of caring for the children, Article 7, § 8(2) of the New York Constitution asserts that nothing shall prevent the Legislature from providing, *inter alia*, for:

" ... the aid, care and support of neglected and dependent children and of the needy sick, through agencies and institutions authorized by the state board of social welfare or other state department having the power of inspection thereof, by payments made on a per capita basis directly or through the subdivisions of the state...."

This is implemented by § 153 of the Social Services Law allowing for reimbursements by the State to social services districts, cities, and towns for the administration of public assistance programs. 385 F.Supp. at 1018.

New York's statutory provisions authorizing the religious matching of children with sectarian foster care agencies, combined with state reimbursement of such institutions for the care of children placed by local government agencies, presented the *Wilder I* court with at least a "theoretical[ ] ... clash between the Establishment and Free Exercise Clauses of the First Amendment." *Id.* The court accepted the argument offered by the defendants there that, "far from requiring or mandating placement according to religion," the New York constitution and statutes at issue "simply *permit* such placement 'so far as consistent with the best interests of the child, and where practicable.'" *Id.* at 1021 (emphasis added). This interpretation of

the New York child placement scheme did not resolve the constitutional question before the panel, however, in part because it did not address the additional problem of state funding of religiously affiliated child care agencies. The three-judge panel therefore found it necessary to examine New York's child care system under the familiar three-part test for Establishment Clause claims set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[4]

Under the first prong of the *Lemon v. Kurtzman* test, the court in *Wilder I* had little difficulty concluding that New York's religious matching and child care funding statutes do not have a solely "secular legislative purpose." *Lemon, supra,* 403 U.S. at 612, 91 S.Ct. at 2111; *see* 385 F.Supp. at 1023–24. Indeed, the court noted that one of the principal objectives of the statutes in question is "to provide for the religious education of foster children in accordance with the parents' wishes." 385 F.Supp. at 1024. Even without such an express religious purpose, however, the panel held that the statutory scheme would be vulnerable under the second prong of the *Lemon* test because its "effect could be to impermissibly inculcate religion." 385 F.Supp. at 1024; *see Lemon, supra,* 403 U.S. at 612, 91 S.Ct. at 2111. At this stage of its analysis, the court took particular note of the pervasively religious character of many of the foster care institutions involved, the impressionable age of most children in foster care, and the fact that "[n]othing in the [funding] statute obligate[s] the recipient to earmark the funds for use solely for the child's temporal needs." 385 F.Supp. at 1024. "[R]egardless of how the state's statutes are labelled and whether or not payments made under them exceed the actual cost of the child's secular needs," the panel observed, "the religious institutions or agencies are free under the statutes to use the funds for advancement of the religions propagated by them." *Id.* Faced with such a statutory scheme, the three-judge court found the conclusion inescapable that the statutes in question "violat[e] ... the literal language of the Establishment Clause." *Id.* "Absent countervailing circumstances," the panel held, the statutes would represent "unwarranted governmental involvement in religion." *Id.*

The "countervailing circumstances" that the *Wilder I* court had in mind, and that it ultimately held redeemed New York's child placement scheme from *facial* attack under the First Amendment, were the Free Exercise rights of New York children in foster care. Analogizing state-funded foster care to the government administration of prisons, hospitals and military facilities, the panel noted the "practical accommodation" of Establishment and Free Exercise Clause principles that has been sanctioned in the latter settings to prevent infringement of the Free Exercise rights of individuals who are in the care or control of government institutions. In this regard, for example, the Second Circuit recently upheld the funding of a chaplaincy program by the United States Army against Establishment Clause attack, in part on the ground that military chaplains are reasonably necessary in at least some settings to assure that the Free Exercise rights of soldiers on duty are not violated. *Katcoff v. Marsh,* 755 F.2d 223 (2d Cir.1985). *See also Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972) *(per curiam )* (reasonable opportunities for religious exercise must be afforded to all prisoners). Likewise, the three-judge panel in *Wilder I* assumed that some accomodation of the Establishment and Free Exercise Clauses would be constitutionally permissible in the New York foster care setting to the extent that the state's religious matching statutes and funding of religiously affiliated child

**4.** Writing for the Court, Chief Justice Burger gleaned the following three requirements from prior cases:

First, the statute [under attack on Establishment Clause grounds] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."

403 U.S. at 612–13, 91 S.Ct. at 2111 (citations omitted).

care agencies was "reasonable and necessary" to protect the Free Exercise rights of children in the state's care. 385 F.Supp. at 1026–27.

The three-judge court acknowledged, first, that the state, standing *in loco parentis,* has the "moral obligation and right" to provide for the essential maintenance and education of children in its care. *Id.* at 1025. The court further assumed that the state's rights and duties in this area would extend to the provision of moral and religious education. *Id.* The state's right and obligation to provide such training arise not only from its status as a surrogate parent, the court reasoned, but from the Free Exercise Clause itself. *Id.* at 1026. Assuming, then, that New York is obligated as a matter of both state law and constitutional principles to provide for the religious upbringing of children in its care, the *Wilder I* court proceeded to consider whether the existing child placement system is a "reasonable and necessary" means to accomplish that end.

The three judge court ultimately concluded that the New York statutes represent, at least on their face, "a fair and reasonable accomodation between the Establishment and Free Exercise Clauses." *Id.* at 1029. Three findings underlay the court's conclusion. First, the panel noted that the historical participation of religious agencies in New York's foster care system had contributed positively to the community and had never been shown to be harmful to children in foster care or to the public. Plaintiffs did not contend, the court assumed, that the system had been used to favor one religion over another or to favor religion over an absence of religion,[5] or that most of the government funds paid to religious child care institutions over the years had *not* been used to meet foster children's "temporal needs." *Id.* at 1028. Second, the three-judge court observed that

plaintiffs had offered no "suitable or constructive alternative" to the present foster care system. The court rejected as fanciful plaintiffs' suggestion that a system of strictly secular homes, agencies and institutions could be established to supplant the state's existing reliance on religious institutions. *Id.* Finally, the panel conjectured that under a "strictly secular" foster care system such as plaintiffs proposed, the state could become "hopelessly entangled in religion, far beyond its existing simple relationship with foster parents and religious institutions," as it became involved in the "custom-tailoring" of particular children's religious training and participation in communal religious activities. *Id.* at 1029. The court noted, for example, the "pervasive religious upbringing" that would be demanded by a child raised in the orthodox Jewish tradition. *Id.* at 1028.

Based on these considerations and assumptions, the three-judge panel upheld the challenged New York statutes on their face. The court expressly left open "other questions presented by the pleadings, including the issue of whether or not one or more of these New York constitutional or statutory sections in their implementation deprive plaintiffs of their First Amendment or other federal Constitutional rights." *Id.* at 1029. Plaintiffs moved for reconsideration of the panel's *per curiam* opinion. The motion was denied on October 16, 1975.

## II. *Subsequent Proceedings*

Following the opinion rendered by the three-judge court in *Wilder I,* the parties to that action engaged in extensive discovery and motion practice. The case eventually was reassigned to this Court in September 1977. In March 1978, at the suggestion of this Court, the New York Civil Liberties Union, co-counsel for plaintiffs in *Wilder v. Sugarman,* filed a new action, *Parker v. Bernstein,* 78 Civ. 957(RJW), in which they

---

**5.** In attacking the operation of New York's foster care system in the instant case, plaintiffs do in fact contend that the existing child placement scheme operates to favor Catholic and Jewish over Protestant children in the provision of suitable quality services, including appropriate reli-

gious instruction. Plaintiffs further contend that certain of the religious agencies attempt to impose their religious beliefs and practices on children of other religions (or without religious affiliation) within their care. *See infra* at 1301–03.

raised similar challenges to the New York child care system, but took into account intervening changes in the system, including changes of personnel in the relevant government and private agencies.[6] By order dated June 2, 1978, the Court dismissed the earlier-filed suit on stated conditions, among them, that the opinion of the three-judge court in *Wilder I* would be treated by this Court as *stare decisis* for purposes of the surviving action.

The complaint filed in *Parker v. Bernstein* was amended on April 17, 1978 and again on November 16, 1978, at which point it was restyled *Wilder v. Bernstein.* In an opinion filed October 1, 1980 (*"Wilder II"*), the Court granted plaintiffs' motion for class certification and granted so much of defendants' motions to dismiss as were directed to plaintiffs' facial attacks in the second amended complaint based on New York statutes and New York City Administrative Code provisions not expressly dealt with by the three-judge court in *Wilder I.* Those additional provisions, this Court found, were nevertheless part of the statutory scheme upheld on its face in *Wilder I,* and could only be attacked as applied in this proceeding. The Court denied the remainder of defendants' motions to dismiss, including their challenge to the taxpayer

plaintiffs' standing, which the Court found met the requirements for taxpayer standing set forth in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). *See* 499 F.Supp. at 991–92.

After additional discovery and motion practice, the Court filed a memorandum decision on March 3, 1981, granting in part plaintiffs' motion for leave to further amend the complaint, and denying certain defendants' motion for an order certifying for appeal the Court's prior certification of the plaintiff class. A third amended complaint was filed March 23, 1981. After two years of extensive discovery and motion practice, a fourth amended complaint was filed April 27, 1983. By this time, the parties had begun preparations for trial, including the drafting of proposed pretrial orders and the filing of motions to preclude various witnesses' testimony.

### III. *Plaintiffs' Contentions*

As reflected in the fourth amended complaint filed April 27, 1983, and plaintiffs' proposed pretrial order submitted to the Court in the spring of 1983, plaintiffs continue to assert four principal constitutional claims against defendants. First, they contend that the New York City child care system[7] operates in a racially discriminato-

---

**6.** The plaintiffs named in the original complaint in *Parker v. Bernstein* were alleged to be two black Protestant children, represented by their mothers and next friends, and four New York taxpayers. The child plaintiffs purported to represent a class of over ten thousand black Protestant children in New York City who were in need of child care services outside the home. The defendants originally joined in the action included the Commissioner of the New York State Department of Social Services, the Comptroller of the State of New York, the Administrator of the New York City Human Resources Administration, the Comptroller of the City of New York, other New York City officials, notably the Administrator of Special Services for Children, and the directors of thirty-two voluntary foster care agencies or agency associations.

**7.** The overall structure of the New York City foster care scheme is not disputed. New York City ("City") comprises a single welfare district within New York State ("State") and, as such, shares statutory responsibility with the State for the welfare of approximately 17,000 New York City children in need of care outside the home.

The New York City Human Resources Administration is charged with carrying out this responsibility, which it does through Special Services for Children ("SSC"), an agency within the administration. SSC provides foster care to between six and ten percent of its children through its own Direct Care program. The remainder, over ninety percent of children in need of foster care, are serviced through contracts SSC has with approximately sixty voluntary agencies, many of them religiously affiliated. Approximately seventy percent of the New York City children SSC places are cared for in individual foster boarding homes; the remaining thirty percent are in congregate care programs, which include group homes, group residences, institutions and diagnostic reception centers. About ninety percent of the *per diem* expenses of children placed by SSC with voluntary agencies are paid from a combination of federal, state and city funds through an elaborate reimbursement mechanism. SSC estimates that in fiscal year 1983, for example, the City paid $194,830,000 to the voluntary agencies for foster care services. *See generally* Affidavit of

ry manner, and that Catholic and Jewish child care agencies contracting with the City have been permitted to receive public funds while engaging in a pattern and practice of discrimination against black children in violation of the Fourteenth Amendment. Plaintiffs allege specifically that there are disproportionately low black and high white populations in Jewish and Catholic agencies; that the referral of children to voluntary agencies by New York City's Special Services for Children ("SSC"),[8] and the placement of children by the agencies in specific programs, has resulted in racial segregation; that racial discrimination by the agencies has been facilitated by SSC's identification of children for placement by race and/or skin color, and by the agencies' unrestricted right to reject children placed with them by SSC under broad, subjective admissions criteria; that agencies are reimbursed by SSC for children who apply directly to the agency rather than being referred by a City placement office; and that some agencies have listed vacancies by race. As a result of the racial discrimination alleged, plaintiffs argue, black children wait longer for placement, are more often inappropriately placed, and are disproportionately placed with agencies or in programs of inferior quality. *See* Fourth Amended Complaint at ¶¶ 49, 51, 53–55, 59, 64–67, 71, 73–74; Plaintiffs' Proposed Pretrial Order at 10–16.

Second, plaintiffs contend that the New York City child care system operates in a manner that discriminates on the basis of religion in that Catholic and Jewish child care agencies are permitted to prefer children of their own religion by virtue of the City's practice of making religion a primary criterion in placing children in foster care. This practice of religious discrimination, plaintiffs maintain, also violates the Fourteenth Amendment. Specifically, plaintiffs allege that Catholic and Jewish agencies care for a disproportionately high popula-

tion of children of their own religion; that SSC refers children to agencies on the basis of their religion even where the parent has not expressed a religious preference; that SSC further facilitates religious discrimination by Catholic and Jewish agencies by identifying the religion of children referred to the agencies and by allowing agencies to veto such placements on the basis of broad, subjective criteria; that SSC reimburses agencies for children who are placed directly by the agency rather than through SSC; that SSC has failed to keep adequate records or vacancy listings so as to monitor the agencies for religious discrimination; and that some agencies have listed vacancies by religion. As a consequence of these practices, plaintiffs contend, Protestant children wait longer for placement and are often placed in inappropriate or inferior programs. *See* Fourth Amended Complaint at ¶¶ 48–49, 51, 53–54, 56, 58, 64–67, 70–71, 74; Plaintiffs' Proposed Pretrial Order at 16–21.

Third, plaintiffs argue that defendants' conduct under the statutes implicated in New York's child care system amounts to the establishment of religion in violation of the First and Fourteenth Amendments. Plaintiffs allege specifically that the child care system involves government financing of agencies that are controlled by or responsible to religious organizations; that certain of these agencies employ clerics or members of religious orders, or give preference in employment to those of the same religion; that many of them offer religious services only of their own faith; that children in their care attend parochial schools or yeshivas; that they prominently display religious symbols on their premises and on special days of religious observance; that many of the agencies share or adjoin premises occupied by a religious order or organization; and that the stated purpose of many Catholic or Jewish agencies is to care

Gail M. Kong, Dep. Admin. of SSC (sworn to July 5, 1984); *see also* City Defendants' Supplemental Memorandum of Law in Support of Proposed Stipulation of Settlement ("City Defendants' Supplemental Memorandum") at 13 n.*.

**8.** As stated *supra* note 7, SSC is the agency within the New York City Human Resources Administration that is directly responsible for placing children in foster care.

for children of their own religion. The purpose and effect of New York's child care system as implemented by defendants, plaintiffs argue, is to advance religion and to favor some religions over others and religion over nonreligion. Plaintiffs contend further that religious child care agencies historically have exerted control over New York City's foster care system, that the City's auditing procedures are inadequate to guard against excessive reimbursement of religious agencies and use of public funds by the agencies to advance impermissible religious interests, and that agencies claim and receive reimbursement for clearly religious purposes, including payments to religious charities or religious orders with which its employees are affiliated. All of these practices, plaintiffs argue, involve an excessive entanglement of government with religion. *See* Fourth Amended Complaint at ¶ 223; Plaintiffs' Proposed Pretrial Order at 21–38.

Fourth, plaintiffs maintain that defendants' practices under the statutory scheme in question burden the Free Exercise rights of Protestant children in violation of the First and Fourteenth Amendments. Plaintiffs assert specifically that there are no agencies operated by members of most of the various Protestant sects; that Protestant children are more frequently placed in unsuitable programs than are Catholic and Jewish children; and that when Protestant children are placed in Catholic and Jewish agencies, they are chilled in the exercise of their own religion by the religious practices and generally pervasive environment of the agency (and in the case of placement with Catholic agencies, are denied access to birth control information and devices and information about obtaining abortions). *See* Fourth Amended Complaint at ¶¶ 68–69, 225; Plaintiffs' Proposed Pretrial Order at 38–39.

In addition, plaintiffs claim that defendants' denial of equal access to child care services for black Protestant children violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *see* Fourth

Amended Complaint at ¶¶ 226, 230; Plaintiffs' Proposed Pretrial Order at 39–41, and that the City defendants' provision of child care services in a manner that discriminates against black Protestant children violates 18 N.Y.C.R.R. §§ 301.1 and 303.2, Fourth Amended Complaint at ¶ 232.

### IV. *Settlement Negotiations*

At earlier stages in the litigation, attempts had been made at settlement, involving all parties, but without success. Shortly before trial was to begin in August 1983, plaintiffs and the City defendants entered anew into settlement discussions with the knowledge of the other parties. Negotiations and discussions with other parties to the action and with interested outside groups continued into 1984. In April 1984, plaintiffs and the City defendants presented a proposed stipulation of settlement to the Court for approval pursuant to Rule 23(e), Fed.R.Civ.P. The Court thereafter directed that notice of the proposed settlement be given to members of the plaintiff class. In an order filed June 15, 1984, the Court granted leave to nineteen voluntary child care agencies ("intervenors") to intervene in the action for the purpose of opposing the proposed settlement.

Through the summer of 1984, the Court received numerous submissions relevant to the proposed settlement from parties, organizations of child care professionals, and individuals expert in child care and the public services field. Beginning August 6, 1984, the Court conducted a hearing on the fairness, reasonableness and adequacy of the settlement. Sparked primarily by the criticisms and suggestions of by the intervenors, the parties thereafter embarked on a series of meetings in open court to attempt to resolve the numerous legal and child care concerns aired at the August 6 hearing. These sessions continued through the fall. On January 2, 1985, the final version of a second proposed stipulation of settlement was submitted to the Court. With one significant addition,[9] that is the Stipulation now before the Court.

---

**9.** Left open in the proposal presented to the

Court in January 1985 was the identity of the

Notice of the second settlement proposal again was directed to be given to members of the plaintiff class, and submissions were filed for and against the revised settlement. A second hearing was held on March 4, 1985, this time focusing primarily on legal objections to the second settlement proposal. By this time, the Commissioner of the New York State Department of Social Services and the Comptroller of the State of New York ("State defendants") had withdrawn their substantive objections to the settlement proposal. *See* Letter of R. Scott Greathead, First Assistant Attorney General, and Judith Kramer, Assistant Attorney General, to the Court (dated Dec. 10, 1984). At this stage, the intervenors had withdrawn their principal child care objections to the settlement, subject to an acceptable designation of the "qualified and impartial person" who would rule on the "therapeutic objections" of contracting agencies to individual placement decisions made by SSC. *See infra* at 1305.

In the months that followed, representatives of plaintiffs, the City defendants and intervenors solicited resumes and interviewed child care experts to decide upon a mutually acceptable "qualified and impartial person." Once that person and an alternate were selected, *see supra* note 9, the Stipulation was circulated for signature and presented to the Court on December 19, 1985.

### V. *The Stipulation*

Little would be gained by summarizing in detail the various features of the Stipulation now before the Court. Indeed, the task would be formidable, since the document runs to forty pages and includes over eighty distinct provisions, many of which contain subparts and cross-references. An overview of the salient features of the Stipulation is helpful, however, for purposes of later discussing the settlement's legality and fairness. The summary that follows, therefore, is meant to serve only

as a point of reference, and does not represent a "binding interpretation" of the Stipulation.

### A. *Purposes*

The stated purposes of the Stipulation are:

to ensure that all New York City children whose placement in foster care is the responsibility of the New York City Commissioner of Social Services receive services without discrimination on the basis of race or religion and have equal access to quality services[,] and to ensure that appropriate recognition be given to a statutorily permissible wish for in-religion placement in a manner consistent with principles ensuring equal protection and non-discrimination as defined in applicable New York State and federal laws, regulations and the Constitution.

Stipulation at ¶ 4 ("(¶ 4)"). The foster care settings contemplated by the Stipulation include foster boarding homes, agency-operated boarding homes, group homes, group residences and child care institutions. *Id.* at 2 n.*. The Stipulation distinguishes in certain of its provisions between "foster boarding homes" and "congregate care programs," but otherwise its terms apply generally to the range of child care facilities and programs funded by SSC, including the City's own Direct Care programs. (¶ 9) The signatories' stated intent in entering into the Stipulation is "to resolve difficult legal issues and to improve the lives of children and families who are part of the [New York City] foster care system" and "to avoid a trial which might set back the efforts made on behalf of children in need of foster care." (¶ 2) The Stipulation further states that "this settlement is in no way an implication of wrongdoing." *Id.*

### B. *Outside Persons*

The Stipulation contemplates three areas in which outside persons would be hired to

---

"qualified and impartial person" who would rule on the therapeutic objections of agencies to particular placement decisions by SSC. The Stipulation subsequently signed by plaintiffs' counsel, the City defendants, defendant Kauf-

man, and nineteen voluntary agencies designates Dr. Richard G. Dudley as that person or, if he is unavailable, Dr. Wayne Hugo Green. (¶ 35)

implement the terms of the settlement proposal. The first area involves the classification or alternative evaluation of child care programs for use by SSC in determining appropriate placements. A system of classification or alternate evaluation would be designed by one or more "qualified consultant(s)" selected by the City with the participation of plaintiffs' counsel, and the signatory and nonsignatory agencies. (¶¶ 6–8)

The second area involves disputes between SSC and contracting agencies that may arise under the Stipulation where SSC places a child with an agency, the agency objects to the placement on stated therapeutic grounds, and SSC seeks to override the agency's objection. The dispute would be referred for resolution to a "qualified and impartial person" paid by SSC. (¶ 35) As noted above, the intervenors had conditioned their approval of the Stipulation on the selection of an acceptable person to fill this position. After several months of interviews and consultations by plaintiffs, the City defendants and the intervenors, the "impartial person" and an alternate were chosen. *See supra* note 9.

Finally, the Stipulation envisions outside monitoring of compliance with the terms of the settlement by a three-member panel. Nominations would be made by a committee of the signatory parties, who would attempt to reach a consensus as to some or all of the panel members. Consensus or not, the Court would make the final selection after a hearing at which all interested parties could participate. The panel would be paid on a *per diem* basis by the City. (¶ 71)

### C. *Placement*

The heart of the Stipulation lies in the provisions governing SSC's placement of children with voluntary child care agencies. Two principles underlie these placement provisions: first, that children would be placed on a first-come, first-served basis; and second, that the expression of a preference (usually by a parent) that a child be placed with an agency of a particular religious affiliation would not give that child greater access to a program over other children for whom the program was also appropriate. (¶¶ 19–20)

Generally, SSC would place a child in the best available program appropriate for the child's needs, using the classification system or alternative evaluation of the various programs that would have been developed by the consultant(s) mentioned previously. Where a parent expressed a preference for placement of the child in an agency or program of a particular religious affiliation (or SSC inferred such a parental preference according to its established procedures), SSC would place the child in the best available program of the relevant religious affinity, provided it had determined that such a placement was in the child's best interest and that it was practicable to make the placement. Such placement would not be "practicable" within the meaning of the Stipulation if there was no vacancy in the best "in-religion" program or if there was a waiting list for that program. Under those circumstances, the parent would have the option of (a) having the child wait until there was a vacancy in the best "in-religion" program, (b) having the child placed in the next best "in-religion" program, or (c) having the child placed in the best available "out-of-religion" program. If the child were over 14, he or she would be consulted and "serious consideration" would be given to the child's wishes. (¶¶ 24, 29–30)

The first-come, first-served principle of placement is tempered by allowance in the Stipulation of exceptions for "compelling therapeutic reasons." (¶ 21) These include, but are not limited to, emergencies and "extraordinary circumstances" in which religious beliefs and practices so pervade a child's life that a particular religious placement is required. *See id.; see also id.* at ¶ 61. The Stipulation also provides that an agency may take a child's race and religion into account in matching the child with a particular foster family, provided those are not the only factors considered. (¶ 25)

SSC would have final administrative authority over all placement decisions "[s]ub-

ject to the terms of [the] Stipulation," and would reimburse agencies only for placements made according to the Stipulation's terms. (¶ 22) An agency could reject a placement by SSC only on the ground that it had no vacancy, that it did not have a suitable foster family for the child in the case of a referral for foster boarding home care, or that there was a valid therapeutic reason for not accepting the child into its program. *See id.* As noted above, disputes between SSC and an agency over a particular therapeutic objection to an SSC placement decision would be referred to the "qualified and impartial person" designated in ¶ 35.

The Stipulation provides that SSC will continue to conduct evaluations of children in accordance with applicable provisions of the New York Social Services Law and "good social work practice." (¶ 48) These evaluations would be conducted prior to placement or, where a child is placed prior to the evaluation, no later than thirty days after placement. *Id.* In evaluating a child after an initial placement has been made, SSC would take into account the child's need to avoid unnecessary movement and, where "good social work judgment" indicated that a change of placement would harm the child, would not require such a move. (¶ 39)

SSC would not identify children for placement by race or religion unless it had determined that such information was therapeutically necessary, or unless an agency had requested such information for stated therapeutic reasons. (¶ 32) Under the Stipulation, SSC must provide agencies with "adequate, current and complete evaluations of all children requiring foster care to the extent available" and, if additional information is deemed necessary, must provide it promptly. (¶ 51) The Stipulation provides for additional diagnoses and evaluations to be performed at an agency's request, including direct observation of the child and family. Disputes concerning

such supplemental evaluations would be referred to the "impartial person" identified in ¶ 35. (¶¶ 49–50) Finally, the Stipulation requires SSC to establish waiting lists for particular agency programs where appropriate (¶¶ 44–47), and requires agencies to report their vacancies for New York City children to SSC. (¶ 53)

### D. *"Specially Designated" Agencies*

The Stipulation acknowledges the existence of "certain religions which have adherents whose religious beliefs pervade and determine the entire mode of their lives, regulating it with detail through strictly enforced rules of the religion." (¶ 61) It assumes further that there are New York City children in need of foster care whose parents "believe it imperative that their children continue to practice the extensive religious customs and rituals which have been part of the child's life." *Id.* Notwithstanding other provisions in the Stipulation, therefore, it authorizes SSC to determine that certain child care agencies or programs will be "specially designated" to care solely for children of these religious groups.[10] The Stipulation provides that where a parent requests placement of a child in such an agency or program, the request shall be honored as long as the placement is "diagnostically appropriate" for the child. Where the child is over 14, his or her wishes are also to be taken into account. (¶ 61(c)) Plaintiffs' counsel retain the right to challenge a "special designation" by SSC that they believe is inconsistent with the terms of the Stipulation. (¶ 61(e))

### E. *Religious Practices*

In order to "ensure the free exercise rights of all children in placement in the agencies," the Stipulation provides that certain policies and practices will be adopted by SSC and followed by the contracting agencies. (¶ 70) Specifically, each agency would provide "comparable opportunities" for children to practice their own religion

---

**10.** Plaintiffs' counsel and the City defendants agreed in negotiating the terms of the original settlement proposal that Ohel Children's Home ("Ohel"), which now provides foster care servic-es for children in an orthodox Jewish setting, would be one such "specially designated" agency. Defendant Lester R. Kaufman, Ohel's Executive Director, is a signatory to the Stipulation.

and observe religious holidays, would permit but not require children in its care to attend religious or holiday observances on its premises, would not impose religious dietary practices (to the extent practicable) on children who do not wish to follow them, would provide benefits and privileges to children without regard to religion, and would not convey religious tenets regarding family planning except in the course of providing religious counseling. *Id.* SSC would ensure that all children have "meaningful access to the full range of family planning information, services and counseling" through the agency or an outside source or both. (¶ 70(7)) Religious symbols would be permitted in children's rooms at their request; agencies would not display "excessive religious symbols." (¶ 70(9))

### F. *Administration and Enforcement*

The Stipulation contains various record-keeping requirements applicable to SSC, the contracting agencies, and the settlement panel. *E.g.,* ¶¶ 63–66, 73. The Stipulation also memorializes an agreement between the State and City to review existing paperwork requirements so as to reduce the paperwork burden on all participants in New York City's child care system. The City would retain an advisor to recommend measures to be taken by both State and City to meet this end. (¶ 62) The City is also committed under the Stipulation to provide the necessary training of SSC staff to ensure compliance with its terms, and to continue efforts to improve the quality of child care. (¶¶ 68–69)

The duration of the Stipulation is three years after full implementation of the classification system or alternative evaluation noted above, or five years after entry of the Stipulation, whichever is sooner. (¶ 79) The City or a majority of the signatory agencies could seek modification of the Stipulation by negotiation with the other signatories or, failing that, by petition to the Court. (¶ 77) In the event plaintiffs' counsel believed any defendants were not complying with the terms of the Stipulation, they would be required to seek voluntary compliance before petitioning the Court for relief. (¶ 75) The final provision of the Stipulation dismisses the State defendants from the action. (¶ 84)

### DISCUSSION

Rule 23(e) of the Federal Rules of Civil Procedure requires that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class...." The court's approval or rejection of a class action settlement typically follows the holding of some form of hearing at which individual class members can voice their objections, if any, to the settlement proposal. 7B C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1797 at 354–55 (2d ed. 1986) ("7B Wright & Miller") (holding of evidentiary hearing and extent of testimony allowed depend on circumstances of case). The Second Circuit has made clear that settlement hearings should not become "mini-trials on the merits," *Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir.1983), for that would "emasculate the very purpose for which settlements are made," *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir.1974) (quoting *Young v. Katz,* 447 F.2d 431, 433 (5th Cir.1971)). *See also Handschu v. Special Services Division,* 787 F.2d 828, 834 (2d Cir.1986). Nonetheless, a district court must "explore the facts sufficiently to make intelligent determinations of adequacy and fairness." *Malchman, supra,* 706 F.2d at 433; *Grinnell, supra,* 495 F.2d at 462–63. Moreover, the Circuit has "strongly hinted" that findings of fact and conclusions of law should be made "whenever the propriety of the settlement is seriously in dispute." *Malchman, supra,* 706 F.2d at 433; *see Plummer v. Chemical Bank,* 668 F.2d 654, 659 (2d Cir.1982) (discussing Title VII class settlements).

In determining the fairness, reasonableness and adequacy of a class action settlement, a district court must consider both "the substantive terms of the settlement compared to the likely result of a trial" and "the negotiating process, examined in light

of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." *Malchman, supra,* 706 F.2d at 433; *see In re Warner Communications Securities Litigation,* 798 F.2d 35, 37 (2d Cir.1986); *Handschu, supra,* 787 F.2d at 833. To this end, some or all of the following factors will be relevant:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell, supra,* 495 F.2d at 463 (citations omitted); *see Malchman, supra,* 706 F.2d at 433–34; *Robertson v. National Basketball Ass'n,* 556 F.2d 682, 684 n. 1 (2d Cir. 1977). Finally, without "in effect try[ing] the case by deciding unsettled legal questions," the court must satisfy itself that "the settlement authorizes no future conduct that is clearly illegal." *Robertson, supra,* 556 F.2d at 686.

■ The Stipulation before this Court for approval, although characterized by its proponents as a class action settlement, must also be treated as a consent decree because it contemplates the Court's continuing jurisdiction over the subject matter of the Stipulation, with powers to enforce and modify its terms upon proper application by one or more parties. *See Berger v. Heckler,* 771 F.2d 1556, 1567–68 (2d Cir. 1985). As a plurality of the Fifth Circuit sitting *en banc* observed in *United States v. City of Miami,* 664 F.2d 435 (5th Cir. 1981) (Rubin, J., concurring in *per curiam* opinion), a court presented with a proposed consent decree faces a similar task to that of the court evaluating a class action settle-

ment, namely, to ascertain that the settlement is "fair, adequate and reasonable." *Id.* at 441; *see also Janus Films, Inc. v. Miller d.b.a. Cable Films,* 801 F.2d 578, 582 (2d Cir.1986). However, "[b]ecause the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect," the terms of a proposed decree "require more careful scrutiny." *City of Miami, supra,* 664 F.2d at 441.

As a matter of policy, courts favor settlement, particularly when the government agency(ies) charged with enforcing the laws implicated in the litigation approve of the compromise achieved. *United States v. Hooker Chem. & Plastics Corp.,* 776 F.2d 410, 411 (2d Cir.1985) (*per curiam* ); *see Citizens for a Better Environment v. Gorsuch,* 718 F.2d 1117, 1127–29 (D.C.Cir. 1983), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984). Nonetheless, a court examining the terms of a proposed consent decree must ascertain both that the settlement is fair to the parties and "that it does not put the court's sanction on and power behind a decree that violates [the] Constitution, statute[s], or jurisprudence." *City of Miami, supra,* 664 F.2d at 441. To the extent "the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed." *Id.* Finally, the court must consider "the nature of the litigation and the purposes to be served by the decree." *Id.* The Supreme Court reemphasized this past Term that the relief provided under a consent decree may properly be broader than what a court could have awarded after trial. *Local Number 93, Int'l Ass'n of Firefighters, AFL–CIO C.L.C. v. City of Cleveland,* ── U.S. ──, 106 S.Ct. 3063, 3076, 92 L.Ed.2d 405 (1986) (*"Cleveland Firefighters"*). Even so, the court must be satisfied that the decree resolves the dispute before it and that it furthers the objectives of the laws on which the parties' claims are based. *Id.*

■ With these principles in mind, the Court turns to the Stipulation at hand.

There is little question that the settlement proposal deserves the Court's careful scrutiny. The Stipulation contemplates substantial changes in the administration of New York City's child care system. It therefore implicates not only significant constitutional and statutory issues, but important social policies as well. Clearly, the Court must do more than simply apply the *Grinnell* factors set forth above. Those factors, like any analytical framework employed to review settlements under Rule 23(e), Fed.R.Civ.P., focus almost entirely on the question of the fairness of a class action settlement to members of the plaintiff class, particularly absent, passive members whose interests might conceivably be compromised by fainthearted or greedy class representatives. *See* 7B Wright & Miller § 1797 at 340–41 & 392–93. To approve the Stipulation, the Court must be satisfied not only that it suffers no obvious legal infirmity, but also that it fairly accommodates *all* of the conflicting constitutional and statutory interests represented in this litigation and does not threaten to impair the delivery of foster care services to New York City children.

The Court first will consider the legal objections raised by the nonconsenting agency defendants ("objectors" or "objecting defendants") to the Stipulation. Then the Court will examine the fairness, reasonableness and adequacy of the settlement proposal as it relates to members of the plaintiff class, to the objecting defendants, to the New York City foster care system, and to the general public.

### I. *Legal Objections*

The objecting agency defendants attack the Stipulation on various legal grounds, some of which go generally to the Court's jurisdiction over the lawsuit and power to approve and enforce the Stipulation, others of which go to the legality of particular provisions in the settlement proposal. The Court first will address the objecting defendants' "jurisdictional" arguments and then will turn to their "substantive" objections.

### A. *Standing*

The objecting defendants challenge the standing of both the taxpayer plaintiffs, Clark, Moody, Cloward and Davis, and the two remaining class representatives, Herbert and Parker.[11]

### 1. *Taxpayer Plaintiffs*

With regard to the taxpayer plaintiffs, defendants argue that, notwithstanding this Court's determination in *Wilder II* that those plaintiffs met the two-prong test for taxpayer standing set forth in *Flast v. Cohen, supra,* 499 F.Supp. at 991–92, the Court should reconsider its original holding in light of recent Supreme Court cases and the nature of the government activity at issue in this case. Defendants' arguments must be rejected.

Contrary to defendants' counsel's assertion at the March 4, 1985 hearing on the fairness and legality of the Stipulation, Hearing Transcript at 913–17 ("(H.T. 913–17)"), neither *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), nor *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), has overruled *Flast v. Cohen, supra,* on which this Court based its 1980 ruling on taxpayer standing. In neither decision did the Supreme Court expressly reject or modify the two-part test established in *Flast* for evaluating taxpayer challenges to Congress's exercise of its taxing and spending powers under Article I, § 8 of the Constitution. Indeed, the Court recently reaffirmed the validity of *Flast v. Cohen* in upholding taxpayers' standing to challenge state programs for

---

**11.** Successive amendments of the complaint expanded the number of named plaintiff class members from two, *see supra* note 6, to seven. At a hearing held on April 20, 1983, the Court accepted Magistrate Harold J. Raby's recommendation that plaintiffs Edwards, Roberts and Torian be dismissed from the action. At that time, plaintiffs' counsel voluntarily withdrew all remaining damage claims. Plaintiffs Wilder and Rodwell had only sought damages in the action. This left plaintiffs Parker and Herbert seeking declaratory and injunctive relief only on behalf of the plaintiff class.

providing remedial instruction to children in nonpublic schools. *See Grand Rapids School Dist. v. Ball,* —— U.S. ——, 105 S.Ct. 3216, 3221 n. 5, 87 L.Ed.2d 267 (1985).[12] The Second Circuit likewise has continued to apply the *Flast* test to determine the standing of taxpayers challenging particular government expenditures, and has distinguished *Valley Forge* on the ground that the government activity at issue in that case was HEW's decision to transfer a parcel of federal property under the Property Clause, Article IV, § 3 of the Constitution, and not an exercise of the taxing and spending power of Article I, § 8. *See Katcoff v. Marsh, supra,* 755 F.2d at 231.

Defendants argue further, however, that the taxpayer plaintiffs here lack standing because even if they obtained the declaratory and injunctive relief they have sought in the action, this would not have any appreciable effect on their tax bills. "If the City did not purchase foster-care services from voluntary agencies," defendants maintain, "its obligations [to care for needy children] would not cease; rather the City would simply be required to provide other services and facilities for children at demonstrably greater expense to the public." Brief in Support of Defendants' Objections to Proposed Settlement ("Objectors' Brief") at 5.

It is unclear whether this argument goes to the question of taxpayer standing under *Flast, supra,* or whether defendants have in mind the general Article III standing requirement that individuals seeking to invoke the jurisdiction of the federal courts must show that they have suffered "some actual or threatened injury as a result of the putatively illegal conduct of the defend-

ant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), that "is likely to be redressed by a favorable decision," *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). In either case, defendants effectively seek to reopen the taxpayer standing question previously determined in *Wilder II.*[13] Defendants concede that that opinion is the law of the case for purposes of the issues decided therein.

■ This Court is free to modify its own pretrial rulings at any time before it enters a final judgment. *See In re United States,* 733 F.2d 10, 13 (2d Cir.1984). Nonetheless, the jurisprudential concerns that underlie the law-of-the-case doctrine counsel against reopening issues previously decided in an action absent compelling circumstances to justify taking a "second look." These include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." 18 Wright, Miller & Cooper § 4478 at 790. *Cf. Doe v. New York City Dep't of Soc. Servs.,* 709 F.2d 782, 789 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983) (same grounds apply to appellate court's adherence to its own prior ruling in same litigation); *see also Baden v. Koch,* 799 F.2d 825, 828 (2d Cir.1986) (same). With these principles in mind, the Court sees no reason to redetermine the taxpayer standing issue it decided in *Wilder II.*

■ As noted above, recent Supreme Court case law only confirms the vitality of the *Flast* test applied in *Wilder II.* Defendants offer no evidence on the taxpayer standing question that was not before the

---

**12.** As this Court noted in *Wilder II, supra,* 499 F.Supp. at 991 n. 25, the *Flast* test applies to plaintiff taxpayers challenging spending by city and state as well as the federal government. The Supreme Court implicitly reaffirmed such applications of *Flast* in *Grand Rapids, supra,* and in *Marsh v. Chambers,* 463 U.S. 783, 786 n. 4, 103 S.Ct. 3330, 3333 n. 4, 77 L.Ed.2d 1019 (1983), both of which involved taxpayer challenges to state expenditures. The objecting de-

fendants do not take issue with this aspect of the Court's 1980 decision.

**13.** Plaintiffs asserted standing at that time under both *Flast v. Cohen* and the general standing requirement of Article III. Having determined that plaintiffs met the requirements for taxpayer standing under *Flast,* the Court found it unnecessary to reach the question of general standing under Article III. *See* 499 F.Supp. at 991 & 992 n. 26.

Court in 1980. Nor does defendants' "tax impact" argument persuade the Court that it committed "clear error" or "manifest injustice" in originally holding that the taxpayer plaintiffs have standing to sue. By suggesting that the taxpayer plaintiffs lack standing because their tax bills would show no appreciable decrease if the City were required to provide foster care by means other than contracting with sectarian agencies, defendants misperceive the nature of plaintiffs' alleged injury and the general requirements for establishing taxpayer standing under *Flast v. Cohen.*

Plaintiffs' grievance is not that their tax bills are too high, but that their tax dollars are being spent on New York City foster care in violation of the United States Constitution, specifically its First and Fourteenth Amendments. Under *Flast,* plaintiffs need not allege that the expenditures they challenge exceed what government normally would spend for legitimate purposes, but rather, that "the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power...." *Flast, supra,* 392 U.S. at 102–03, 88 S.Ct. at 1954. As this Court noted in *Wilder II,* it is well settled that the Establishment Clause is such a "specific constitutional limitation" within the meaning of *Flast.* 499 F.Supp. at 992. In sum, nothing tempts the Court to disturb its previous ruling that the taxpayer plaintiffs have standing to sue on the Establishment Clause claims they have raised in this action.

### 2. *Class Representatives*

Defendants' challenge to the standing of Barry Parker and Robin Herbert as representatives of the plaintiff class raises not one legal objection, but two. Defendants contend, first, that Parker and Herbert lack standing because their individual claims by now have become moot. Parker, plaintiffs' counsel conceded at the March 4, 1985 hearing, was arrested on a delinquency charge while the instant litigation was in discovery and disappeared before defendants could depose him a second time. (H.T. 925–26) Herbert eventually was placed with one of the Catholic agency defendants. Plaintiffs' counsel stated at the hearing, however, that Herbert had testified in deposition that she had been denied access to birth control information while at the agency. (H.T. 924) In any event, both plaintiffs presumably are now beyond the age when they would require or request foster care services to be provided through SSC.[14] Second, defendants suggest that, even assuming plaintiffs' individual claims are still viable, they are not representative of the class plaintiffs purport to represent—all black Protestant children in need of foster care services in New York City—because "the needs of individual children are so diverse." Objectors' Brief at 6 n.*.

Defendants' second "standing" argument can be dispatched quickly. In the form of a challenge to the class representatives' standing, defendants actually call into question the typicality of the class certified by the Court in 1980. Defendants vigorously litigated the typicality issue at the time plaintiffs moved for class certification, along with the other class action prerequisites under Rule 23(a), Fed.R.Civ.P. The Court ultimately resolved those issues in plaintiffs' favor in *Wilder II. See* 499 F.Supp. at 992–94. As the Court found above with respect to taxpayer standing, defendants in effect seek to reopen a matter previously decided in this litigation. Under the law-of-the-case doctrine discussed above, this Court will not disturb its prior certification of the plaintiff class absent a showing of compelling reasons to

**14.** Based on allegations in the fourth amended complaint, the Court estimates that Parker would now be nineteen years, and Herbert, twenty. The New York Social Services Law appears to contemplate the provision of publicly administered foster care until a child reaches eighteen. *See, e.g.,* N.Y.Soc.Serv.Law § 371(1) ("child" defined for purposes of child care statutes as "person actually or apparently under the age of eighteen years"); *id.* § 392(1)(b) ("child" for purposes of provisions governing Family Court review of foster care placements means "child under the age of eighteen years for whom an authorized agency is providing foster care," except pursuant to certain Family Court orders).

reexamine the question at this late juncture. *See supra* at 1310.

Defendants point to no change in the law that mandates decertification of the plaintiff class.[15] Nor do defendants offer new evidence to support their claim that black Protestant children in need of foster care are too "diverse" to properly be treated as a class in this litigation.[16] In essence, defendants simply recast the arguments they originally made against class certification in 1980. The Court's response to those arguments in *Wilder II* holds true today:

> There is no requirement that the factual basis for the claims of all members of a purported class be identical.... In the instant case, all the children in plaintiffs' class share several crucial characteristics: They are all children who are in need of placement, they are black, and they are either Protestant or of other non-Catholic or non-Jewish faiths. The individual differences among the plaintiffs and between the plaintiffs and other class members do not affect the plaintiffs' central claim that all members of the class have been denied placement because of their race and religion and not because of their individual circumstances.

499 F.Supp. at 992–93.

■ That "individual children are ... diverse" is not seriously disputed in this litigation. The relevant question for purposes of determining the typicality of class members' claims, however, is not whether class members are *different* from one another. Some differences in background and circumstances must be assumed. Rather, the question is whether, assuming class members share certain characteristics relevant to the class's claims, each class member's situation is so *unique* that one could not adequately represent the interests of oth-

---

**15.** *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), on which plaintiffs rely, signaled no change in the substantive standard for certifying classes under Rule 23, Fed.R.Civ.P., and is factually distinguishable from the instant case. In *Falcon,* the Supreme Court held, the district court had erred in permitting the named plaintiff, a Mexican-American who was denied a promotion by the defendant employer, to represent a class of Mexican-Americans who had applied for employment with the defendant but were not hired. The Supreme Court observed that plaintiff's complaint, which contained only a conclusory paragraph alleging commonality, typicality, numerosity and adequate representation, *see* 457 U.S. at 151 n. 3, 102 S.Ct. at 2367, n. 3., "provided an insufficient basis for concluding that the adjudication of his claim of discrimination in promotion would require the decision of any common question concerning the failure of [the defendant] to hire more Mexican-Americans." *Id.* at 158, 102 S.Ct. at 2371. The latest complaint filed in the instant action suggests no such dichotomy between the individual claims of the named plaintiffs and those of the class they purport to represent. The specific allegations of the named plaintiffs each present a different case history, but the facts alleged are consistent with and reinforce the class claims raised elsewhere in the pleading. *Cf.* Fourth Amended Complaint at ¶¶ 125–51 (Barry Parker) and ¶¶ 152–62 (Robin Herbert) *with id.* at ¶¶ 8–13 (class action allegations), ¶¶ 43–74 (general allegations of systemic discrimination against black Protestant children in New York City foster care system) *and* ¶¶ 223–32 (class-based causes of action). *Falcon* therefore provides no reason to reconsider the propriety of plaintiffs' class-based claims.

**16.** The only "new evidence" defendants suggest may be relevant to the question of typicality is in the form of statistics presented to the Court in opposition to the original settlement proposal and now to the Stipulation. These statistics purport to show that substantial numbers of black Protestant children are in the care of Catholic and Jewish agencies. *See* Objectors' Brief at 28 n.*; *see also* Supplemental Submission By Certain Voluntary Agency Defendants in Further Opposition to Proposed Settlement (filed Aug. 22, 1986) (affidavit and annexed copy of 1985 Annual Report of The Catholic Charities of the Archdiocese of New York) ("Supplemental Submission by Certain Objectors"). Such statistics, of course, provide no support for defendants' "diversity" argument. At best, such statistics go to the merits of plaintiffs' claims of unequal access to Catholic and Jewish child care programs. As the Court discusses further *infra,* however, such statistical evidence both underestimates and oversimplifies the nature of plaintiffs' attacks on the New York City child care system. Plaintiffs' claims do not hinge upon the absolute numbers of black Protestant children in various foster care programs, but rather focus on their proportional distribution within the system, the ease with which they are placed in appropriate programs, and the treatment they receive after they are placed.

ers in the class. *See* 7A Wright & Miller § 1764 at 235–41 & 256–59. Defendants did not persuade the Court in 1980 that individual black Protestant children's claims of discrimination in New York City foster care are so unique as to preclude their litigation as class claims. Defendants do not persuade the Court now that its original determination was in error.

■ Defendants' argument that the named plaintiffs' claims are now moot raises different concerns. It is well established that the rendering moot of a class representative's individual claim does not necessarily require dismissal of the class action. Once a class is certified, it acquires "a legal status separate from the interest asserted by [the class representative]." *Sosna v. Iowa,* 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975). Where a named plaintiff's claim has become moot, the class action will be allowed to proceed, and the plaintiff may even be permitted to continue representing the class, as long as there remains a "live" controversy between the defendants and at least some members of the class, and provided the named plaintiff retains some "personal stake" in the outcome of the litigation. *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980). In *Geraghty,* the named plaintiff's individual challenge to the validity of the United States Parole Commission's Parole Release Guidelines had been rendered moot by the plaintiff's mandatory release from prison after the district court had *denied* his motion for class certification and while an appeal of that ruling was pending. The Supreme Court nonetheless held that there remained a live controversy, as evidenced by motions filed by other prisoners seeking to "intervene" in the action or be substituted for the named plaintiff as class representatives. 445 U.S. at 396, 100 S.Ct. at 1208. Moreover, the Court held that the named plaintiff could continue to represent the class at least for purposes of appealing the certification denial because his "vigorous advocacy" on the certification question had demonstrated his continuing "personal stake" in at least that aspect of the suit. *Id.* at 404, 100 S.Ct. at 1212.

Plaintiffs in the instant case appear to concede that the individual claims of plaintiffs Herbert and Parker have become moot. *See* Plaintiffs' Second Memorandum in Support of Proposed Settlement ("Plaintiffs' Second Memorandum") at 55–57. Before approving the Stipulation before it, therefore, the Court must satisfy itself both that a live case or controversy continues to exist between at least some members of the plaintiff class and some defendants, and that the named plaintiffs retain sufficient personal interest in the litigation that they would continue adequately to represent the interests of the class through the implementation of the proposed decree. Factors relevant to the latter determination include whether the interests of the named plaintiffs now conflict with those of the class, and whether plaintiffs' counsel continue to pursue the class's interest in a competent, vigorous manner. *See Sosna, supra,* 419 U.S. at 403, 95 S.Ct. at 559.

In some respects, the question of mootness raised here is easy to resolve. *Wilder v. Bernstein* certainly is not a "dead" case or controversy. The religious matching and funding statutes that plaintiffs challenge as applied remain in force. New York City continues to contract with religious agencies for child care. Moreover, there is no indication that the City has changed its general placement procedures, or the agencies their internal operations, so as to satisfy plaintiffs' original objections to the New York City child care system. *Cf. Armstrong v. Ward,* 529 F.2d 1132 (2d Cir.1976) (prisoner class action rendered moot by closing of correctional facility that was subject of lawsuit). Furthermore, under the factors set out in *Sosna, supra,* there is no suggestion that the named plaintiffs' interests now *conflict* with those of the class, or that plaintiffs, through their attorneys, have not continued vigorously to represent the class's interests. *See also infra* at 1340.

At the same time, the Court cannot ignore that pretrial discovery in the action

closed in 1983. In the interim, counsel for the parties have been absorbed in negotiating the terms of a possible settlement. Because substantial time has elapsed since the parties conducted formal discovery of each other's legal and factual contentions, the facts underlying plaintiffs' claims necessarily have grown stale. Before this Court approves a settlement of the action which, by its terms, would extend the life of the lawsuit—and with it the Court's oversight—for at least three years, *see supra* at 1307, the Court requires some verification from plaintiffs that a live controversy continues to exist between some members of the plaintiff class and some defendants,[17] and further, that the named plaintiffs retain personal interest in the outcome of the litigation. Accordingly, the Court's approval of the Stipulation will be conditioned on, *inter alia*, plaintiffs' counsel's submission of affidavits from at least three unnamed members of the plaintiff class, and from at least one of the named plaintiffs, by themselves or their next friends, attesting to the vitality of the dispute and their interest in pursuing it through the implementation of the proposed settlement.

## B. *State Action*

▆ At the hearing held on March 4, 1985, the objecting defendants clarified the state action argument they had put forward in their latest brief. *See* Objectors' Brief at 42–43. Defendants do not contend that they are not state actors so as to argue that the Stipulation violates their rights as "citizens" under the Free Exercise Clause of the First Amendment. (H.T. 937) Whatever First Amendment interests defendants seek to protect, they argue, are those of the children in their care and their parents. *Id.* Rather, defendants' state action argument focuses on the extent to which they may be considered state actors

for purposes of plaintiffs' claims under 42 U.S.C. § 1983 and the First and Fourteenth Amendments, and for purposes of the Stipulation that purports to resolve those claims.

It is unnecessary for the Court to hold that the defendant agencies are state actors in order to approve the Stipulation and enforce its terms. As the Court holds below, the Stipulation directly binds only its signatories, and would be enforced by this Court against only those parties, "their officers, agents, servants, employees, and attorneys, and ... those persons in active concert or participation with them who [have] receive[d] actual notice of the [Stipulation]." Rule 65(d), Fed.R.Civ.P. *See infra* at 1319–20. At the hearing on March 4, 1985, plaintiffs' counsel indicated their intention to seek dismissal of the objecting defendants from the action if the Court approved the Stipulation. (H.T. 1088–89) Under those circumstances, the Court's power to enforce the Stipulation's terms against the objecting agency defendants would extend, if at all, to the defendant agencies as "persons in active concert or participation" with the City by virtue of the City's contract with those agencies to provide foster care for New York City children. There can be no question that the City is a state actor for purposes of the lawsuit, and for purposes of approving and enforcing the Stipulation. Whether the objecting defendants should properly be considered state actors in this litigation therefore is irrelevant to the Court's present inquiry.

Defendants' assertions on the question of state action nevertheless prompt a few observations. The "ultimate issue" in determining whether a person is subject to suit under § 1983 or the Fourteenth

---

**17.** The Court takes judicial notice of the pendency of a lawsuit recently filed in this District that relates to certain of the issues presented in *Wilder* and indicates that a live controversy still exists at least with respect to those issues. In *Arneth v. Gross,* 86 Civ. 3296(RO) (S.D.N.Y.), a registered nurse formerly employed by one of the Catholic foster care agencies and a nineteen year old girl who had been placed with the

agency by SSC originally sued state, city and agency officials on behalf of a class of children in foster care who had allegedly been prevented from practicing contraception in violation of the United States Constitution and certain federal statutes. Plaintiffs' motion for a preliminary injunction in that action was pending as of the date of this Opinion.

Amendment is the same: "is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell-Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982). The courts of this Circuit have held consistently that private child care institutions falling within the definition of "[a]uthorized agenc[ies]" under N.Y.Soc.Serv.Law § 371(10) are acting "under color of state law" for the purpose of § 1983. *See, e.g., Duchesne v. Sugarman,* 566 F.2d 817, 822 n. 4 (2d Cir. 1977); *Perez v. Sugarman,* 499 F.2d 761 (2d Cir.1974); *Brooks v. Richardson,* 478 F.Supp. 793, 795 (S.D.N.Y.1979). Notwithstanding the established law in this Circuit, the objecting defendants argue that two Supreme Court cases, *Rendell-Baker v. Kohn, supra,* and *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), support the conclusion that the agencies are not state actors for purposes of this lawsuit. In those cases, the Supreme Court held that a private school and private nursing homes, respectively, were not state actors for purposes of the lawsuits in which they had been joined even though both received substantial state funding and were subject to extensive government regulation.

Neither *Kohn* nor *Blum* compels the conclusion that the defendant agencies are private actors for purposes of this litigation. The three-pronged nexus test applied by the Court in those cases merely recapitulates the approach taken in prior state action decisions. *See Blum, supra,* 457 U.S. at 1004–05, 102 S.Ct. at 2785–86 (summarizing three-part inquiry); *Kohn, supra,* 457 U.S. at 840–42, 102 S.Ct. at 2770–72 (applying *Blum* factors). Furthermore, the cases are readily distinguishable from *Wilder v. Bernstein.* As the Supreme Court stated in *Blum,* "adherence to the 'state action' requirement ... requires careful attention to the gravamen of the plaintiff's complaint." 457 U.S. at 1003, 102 S.Ct. at 2785. The Court noted that the plaintiffs in *Blum,* who objected to the involuntary discharge or transfer of Medicaid patients by the nursing home defendants, "[were] not challenging particu-

lar state regulations or procedures...." *Id.* The Court distinguished *Blum* from "'state action' cases in which the challenged conduct consists of enforcement of state laws or regulations by state officials who are themselves parties in the lawsuit...." *Id.* at 1004, 102 S.Ct. at 2785. *Wilder* plainly presents an attack on a state regulatory scheme, New York's statutes governing the funding of sectarian child care agencies and the religious matching of children in need of foster care with those agencies. Moreover, the lawsuit challenges the *joint* implementation of those state statutes by New York City and the religious agencies with which it contracts. In *Kohn,* which involved the discharge of a vocational counselor hired by a private high school under a federal grant, the Court found it significant that the substantial state and federal regulations to which the school was subject did not extend for the most part to personnel decisions. *See* 457 U.S. at 833–34 & 841–42, 102 S.Ct. at 2767–68 & 2771–72. In contrast, the conduct about which plaintiffs complain in *Wilder,* for example, the placement decisions made jointly by SSC and the voluntary agencies that allegedly give preference to white Catholic and Jewish children, are the subject of considerable state and city regulation.

Thus, assuming that not *every* action taken by the defendant agencies is "state action" for purposes of § 1983 or the Fourteenth Amendment, *see Perez, supra,* 499 F.2d at 766, defendants can scarcely argue that *none* of the agency conduct challenged in this lawsuit was done under color of state law. Plainly, an agency's decisions relating to the acceptance and care of a child placed with the agency by SSC, where the State and City remain ultimately responsible for the child's welfare, *see* N.Y. Soc.Serv.Law § 395, and where the agency's decisions are directly circumscribed by state and/or city regulations, contain "a sufficiently close nexus [with] the State ... so that the action of the [agency] may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.,* 419

U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).

### C. Scope of Proposed Decree

The objecting defendants argue further that the Stipulation extends beyond this Court's legitimate power to enforce, both in the scope of its substantive terms and in the reach of its enforcement provisions. On both counts, however, defendants fail to differentiate between a settlement on consent and a judgment after trial, or defendants make the correct distinction but reach the wrong conclusion.

#### 1. Substantive Terms of Decree

Defendants cite *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d Cir.1984), for the general proposition that the remedial measures proposed in the Stipulation exceed the proper scope of federal judicial power under Article III of the Constitution. Defendants implicitly concede, however, that whatever relevance *Pennhurst* bore to the original settlement proposed in April 1984 has been extinguished by the addition of ¶ 84 to the Stipulation, which provides for the dismissal of the State defendants. The Eleventh Amendment concerns with which the Supreme Court grappled in *Pennhurst* therefore present no obstacle to the Court's approval of the revised settlement now before it.

Defendants' heavy reliance on *Society for Good Will* is more troubling. In that opinion, it will be recalled, the Second Circuit vacated and remanded a judgment and decree that was entered following a lengthy trial and that mandated broad changes in the living conditions and training of residents at Suffolk Development Center, a state-operated school for the mentally retarded. In *Society for Good Will*, the circuit panel upheld certain of the district court's findings of unconstitutional deprivation as supported by the record, reversed others as unsupported or as not giving rise to a federal constitutional violation, and remanded for clarification of the federal constitutional or statutory bases on which additional portions of the decree were based.[18]

Aside from hortatory language in the opening paragraph of the circuit court's opinion concerning "the constitutional powers and constraints of federal courts," 737 F.2d at 1242, *Society for Good Will* has little or no direct bearing on the matters before this Court in the instant case. The Due Process violations claimed in that case—deprivations of food, clothing, shelter, medical care, and training, as well as undue physical restraints—are entirely different from the First Amendment and Equal Protection claims raised in this action. It follows, therefore, that the constitutional standard applied by the district and circuit courts to the deprivation-of-liberty claims asserted in the case—whether the decisions of the professionals involved represented "a substantial departure from accepted professional judgment, practice, or standards," 737 F.2d at 1248 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982)) —is not directly applicable here.[19]

---

**18.** Because Chief Judge Weinstein had entered the judgment and decree in *Society for Good Will* before the Supreme Court handed down its decision in *Pennhurst, supra,* he had premised certain of the relief ordered on findings of state law violation, and in other parts of the decree had not specified which remedies were based on state law and which on the federal Constitution. *See* 737 F.2d at 1252.

**19.** This is not to say that the professional judgments of child care experts and practitioners are irrelevant to the Court's inquiry. The therapeutic concerns raised by child care professionals who commented on the original settlement

proposal weigh heavily in the Court's evaluation of the fairness of the revised Stipulation. *See infra* at 99–115, 1345–53. Furthermore, one of the key criticisms made of the first settlement draft—and therefore one of the parties' prime focuses in negotiating modifications of that proposal—was that it centralized critical evaluation and placement decisions in SSC and effectively precluded child care professionals in the voluntary agencies from exercising their clinical judgment in accepting or rejecting children referred by the City agency. *Infra* at 1346. The Court considers below the extent to which modifications made in the settlement proposal adequately address this concern. *Id.* at 1347–51. Of

More importantly, the decree entered in *Society for Good Will* followed a lengthy bench trial, and therefore was properly scrutinized by the circuit court in light of the claims actually pressed at trial and the evidence adduced at that time. Defendants here suggest that this Court's power to approve a decree entered on consent before trial is *narrower* than its power to fashion an injunctive remedy after a trial on the merits. In fact, the opposite is true. The Supreme Court expressly reaffirmed courts' broad power to approve consent decrees this last Term, when it held that a district court was not barred from approving a consent decree in a Title VII class action even though the court would have lacked power to impose such a decree after trial. *See Cleveland Firefighters, supra,* 106 S.Ct. at 3076–79.

In the same opinion, the Supreme Court summarized the correct standard for judging the proper scope of a consent decree. To pass muster, the Court held, a consent decree must "come within the general scope of the case made by the pleadings" and "further the objectives of the law upon which the complaint was based." *Id.* at 5011. Applying these principles to the Stipulation at issue here, the Court is satisfied that the proposed settlement "come[s] within the general scope of the case made out by the pleadings." Even a cursory comparison of the allegations in the fourth amended complaint (as supplemented by the contentions in plaintiffs' proposed pretrial order), *see supra* at 1301–03, with the terms of the Stipulation, *supra* at 1304–07, reveals remarkable parity between the various constitutional infirmities plaintiffs have alleged to exist in New York City's child care system and the remedial measures incorporated in the Stipulation. To mention a few examples, both the pleadings and Stipulation address SSC's identifi-

cation of children awaiting placement by race and religion, the agencies' discretion to reject children initially placed with them by SSC, SSC's reimbursement of agencies for children the agencies admit directly rather than through SSC's normal placement procedures, the need for complete and accurate recordkeeping by both SSC and the agencies (including waiting lists for agency vacancies), children's compulsory participation in some agencies' religious observances, and inadequate access of children in some agencies to birth control information and services.

Although comprehensive and in several respects ambitious, the Stipulation proposed can fairly be said to "spring from and serve to resolve" the central disputes between at least some of the parties to this litigation. *Cleveland Firefighters, supra,* 106 S.Ct. at 3077. The Court still must consider whether the Stipulation "further[s] the objectives of the law[s] upon which the complaint was based." *Id.* This question the Court examines below in reviewing the fairness, reasonableness and adequacy of the settlement proposal. *See infra* at 1353–54. At this point, the Court turns to defendants' objections concerning the legitimate scope of the Stipulation's enforcement provisions.

### 2. *Enforcement of Decree*

Paragraph 75 of the Stipulation, entitled "Enforcement," provides:

> In the event that plaintiffs determine that any defendants are not in compliance with the terms of this Stipulation, plaintiffs, prior to seeking the assistance of the court, shall make reasonable efforts to determine whether voluntary compliance can be obtained by notifying such defendant(s) whom plaintiffs believe are not in compliance, and by requesting a meeting with such defendant(s) which,

course, to the extent defendants are troubled by the Court's contemplated role in overseeing the implementation of the Stipulation—and arguably "intruding" on the professional decision-making of child care practitioners—it is worth noting that a settlement, particularly one such as that negotiated here by representatives of the public and private agencies actually involved in

the delivery of foster care services in New York City, should result in *less* judicial intrusion in the agencies' affairs than would a decree that was wholly " 'a creature of judicial cloth.' " *Citizens for a Better Environment, supra,* 718 F.2d at 1128 (quoting *Weinberger v. Catholic Action of Hawaii/Peace Educ. Project,* 454 U.S. 139, 141, 102 S.Ct. 197, 200, 70 L.Ed.2d 298 (1981)).

unless such defendant(s) refuse to meet, shall be held within two weeks of notification. If the matter is not resolved voluntarily following these efforts, plaintiffs may petition the court for relief. Nothing in this Stipulation shall be construed to waive a signatory's right to assert that this Court has jurisdiction over a matter which may arise in the future on account of actions or omissions of nonparties that may in whole or in part conflict with the terms of this Stipulation.

The objecting agency defendants argue that, inasmuch as they have not signed the Stipulation, they are not bound by its terms and therefore are beyond the Court's enforcement power under ¶ 75. Defendants' argument has merit to a point.

"It has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation." *Cleveland Firefighters, supra,* 106 S.Ct. at 3079. *See Kirkland v. New York State Dep't of Correctional Servs.,* 711 F.2d 1117, 1126 (2d Cir. 1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984); *Vulcan Soc'y of Westchester County, Inc. v. Fire Dep't of White Plains,* 505 F.Supp. 955, 967–68 (S.D.N.Y.1981) (certain of intervenor unions' objections to consent judgments presented in consolidated employment discrimination cases were reasonable but would not prevent approval). Thus, the mere fact that certain of the original defendants to this action object to the proposed Stipulation does not in itself bar approval of the settlement. At the same time, "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement." *Cleveland Firefighters, supra,* 106 S.Ct. at 3079.

A consent decree may conceivably burden the rights of third parties in various ways. A decree could, for example, expressly require the party to perform or refrain from performing certain acts. Alternatively, the decree could impose no specific duties on the third party, but rather require the third party to comply generally with the decree's terms or be subject to its enforcement provisions. A consent decree would also burden third parties if it effectively altered specific contract rights they possessed at the time the settlement was given effect. *See Kirkland, supra,* 711 F.2d at 1126–28; *City of Miami, supra,* 664 F.2d at 446–47.

In the instant case, the objecting defendants have asserted no counterclaims or cross-claims that would be extinguished by the entry of the Stipulation. Defendants also point to no term of the Stipulation that expressly requires them to take particular action or refrain from acting. Similarly, defendants have identified no specific contractual right they possess that would be altered by the terms of the Stipulation. (H.T. 1053–54)[20] Defendants argue, how-

20. The objecting defendants do argue that the Court's approval of the Stipulation will effectively diminish their power to bargain with the City over the terms of future contracts (H.T. 1054–56), and that it violates certain "expectancies" they have acquired in doing business with the City over the years (H.T. 1055–56). *See also* Objectors' Brief at 64–65. While defendants' concerns certainly bear upon the fairness of the Stipulation to the objecting agencies as nonparties likely to be affected by the settlement, *see infra* at 1342–44, they do not present legal grounds for disapproving the settlement. Assuming that entry of the Stipulation would effectively make "nonnegotiable" issues that heretofore were the subject of "arm's-length" bargaining between SSC and the agencies, defend-

ants have not demonstrated that they have acquired an enforceable "right" to bargain with the City over certain issues or from a particular position of strength.

Defendants maintain that they have invested substantial sums in the past to tailor their programs to meet the needs of New York City children, with the expectancy that they could continue to do business with the City as before. (H.T. 1056) Indeed, numerous submissions made to the Court on the subject of the proposed settlement note the valuable steps taken by the voluntary agencies in recent years to develop and improve their programs in order to deal with the increasingly older and more troubled children in New York City's foster care

ever, that to the extent ¶ 75 of the Stipulation is intended to bind them to the terms of the settlement without either their consent or a finding of liability against them, it "flies in the face both of due process of law and the 'fundamental limitations on the remedial powers of the federal courts.'" Objectors' Brief at 58. Assuming certain facts, defendants' objection has merit.

■ As a general rule, a decree entered on a stipulation or after settlement binds only those who are parties to it. *LaRouche v. Federal Bureau of Investigation*, 677 F.2d 256, 258 (2d Cir.1982); *Madison Square Garden Boxing, Inc. v. Shavers*, 562 F.2d 141, 143 (2d Cir.1977); *United States v. Carter Products, Inc.*, 211 F.Supp. 144, 148 (S.D.N.Y.1962). This principle does not, however, alter the equally established rule that a decree of injunction, whether entered on consent or after a hearing or trial, binds not only the parties to it but those in privity with them. *Regal Knitwear Co. v. National Labor Rels. Bd.*, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945); *Hart v. Community School Bd. of Brooklyn*, 383 F.Supp. 699, 753 (E.D.N.Y.1974), *aff'd*, 512 F.2d 37 (2d Cir. 1975). Rule 65 of the Federal Rules of Civil Procedure incorporates this common law rule in defining the limits of federal court injunctions:

> Every order granting an injunction ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Rule 65(d), Fed.R.Civ.P. Whether an individual or entity not a party to a consent decree nevertheless is in privity or "in active concert or participation" with one or more of the consenting parties so as to be bound by the terms of the decree necessarily depends on the facts of the case. *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979).

■ In the instant case, it cannot seriously be disputed that the contract relationship now existing between SSC and voluntary child care agencies creates privity between SSC and the agencies. Were the agencies—including the objecting defendants—to continue to contract with SSC to provide foster care services for New York City children, they would unquestionably be "in active concert or participation with" the City defendants for purposes of enforcing the terms of the Stipulation under Rule 65(d), Fed.R.Civ.P. If the objecting agencies ceased contracting with SSC, however, they plainly would be beyond the Court's power to enforce a settlement such as the one now proposed.

Paragraph 75 of the Stipulation, on its face, is not entirely consistent with these assumptions. The enforcement mechanism it establishes applies by its terms to *"any defendants ... not in compliance with the terms of the Stipulation."* As discussed above, the Stipulation can properly bind only its signatories and those in privity or "active concert or participation" with them. The reference to "any defendants" therefore is, at least on its face, overbroad. It seems clear, however, that plaintiffs would have no reason to seek enforcement of the Stipulation against a voluntary child care agency *unless* that agency were contract-

---

system. *Unfortunately for defendants, the* record also documents the extent to which both the State and City in recentl years have intensified their regulation of the child care system, often by imposing new standards and reporting requirements unilaterally on the agencies. As the Court discusses further below in examining the fairness of the settlement to the objecting defendants, the Child Welfare Reform Act of 1979, N.Y.Soc.Serv.Law §§ 398-b, 409—409-h, and New York City's Program Assessment System, are but the most obvious examples of re-

cent state statutes and other government regulations that have affected the way child care is provided, funded and monitored in New York City. *See infra* at 1343–44. If the objecting agencies have any justified "expectancy" regarding future dealings with the State and City, it is that they may be subject to *new* forms of government regulation. *See also id.* The Stipulation proposed here does not violate any legal or equitable right of the agencies to negotiate or do business with SSC in the future in any particular way.

ing with SSC to care for New York City children (and therefore "in active concert or participation" with the City agency). The imprecise reference in ¶ 75 to "any defendants" thus does not present a fatal defect in the Stipulation. The Court nevertheless conditions approval of the Stipulation on the interpretation of ¶ 75 suggested above: that, after attempting by informal means to obtain voluntary compliance, plaintiffs may petition this Court for relief against *any signatory defendant or anyone in active concert or participation with them who has actual notice of the Stipulation.*

### D. Standard for Approving Particular Remedy

The Court moves now to the objecting defendants' arguments concerning particular terms of the Stipulation. They argue, first, that the "first-come, first-served" principle of placement governing many of the settlement's specific provisions represents a "race-conscious" remedy that can only be approved upon a *prima facie* showing of discrimination. Defendants maintain that the statistics offered by plaintiffs in support of the Stipulation fail to make out a *prima facie* case. It is unnecessary for the Court to reach the latter point because defendants' primary argument fails as a matter of language, logic and law.

Defendants state correctly that in *Kirkland, supra,* the Second Circuit held that "the principal requirement for ... a settlement [implementing race-conscious remedies] is that there be a reasonable basis for the compromise, *i.e.,* some showing of probability of success on the merits." 711 F.2d at 1130. The reason for the requirement, the Circuit explained, is that "[w]hen the settlement contains race-conscious relief affecting third parties, some well substantiated claim of racial discrimination against the plaintiff class is necessary 'to ensure that new forms of invidious discrimination are not approved in the guise of [race-conscious remedies].'" *Id.* (quoting *Setser v. Novack Inv. Co.,* 657 F.2d 962, 968 (8th Cir.1981)). In the Title

VII case before it, the circuit panel held that the district court had properly approved a class action settlement where the plaintiffs had made a *prima facie* case of employment discrimination by a statistical showing of disproportionate racial impact. *Id.*

From *Kirkland,* defendants leap to the Stipulation proposed in this case, and argue that it must be disapproved because plaintiffs have not made a *prima facie* showing of discrimination. Although pressed by the Court on this issue at both the August 1984 and March 1985 hearings, however, defendants have yet to identify the "race-conscious" aspects of the proposed settlement that even arguably bring it within the reach of *Kirkland.* In *United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Supreme Court used the term "race-conscious" to describe an affirmative action plan providing for preferential hiring and training of black employees. In *Weber,* and in every other relevant case of which this Court is aware, the phrase "race-conscious remedy" has been used to identify a plan, voluntary or court-imposed, that attempted to correct for past discrimination in employment either by the use of specific goals or quotas in minority hiring and/or promotion, *e.g., Cleveland Firefighters, supra,* 106 S.Ct. at 3072, or by adjustments in promotional test scores, *e.g., Bushey v. New York State Civ. Serv. Comm'n,* 733 F.2d 220, 228 (2d Cir.1984), *cert. denied,* 469 U.S. 1117, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985), or job eligibility lists, *e.g., Kirkland, supra.* The common thread running through these "race-conscious" measures is the *differential treatment* of individuals of a particular race within a larger group designed to eliminate discrimination against the particular racial group.

The stated purpose of the "first-come, first-served" concept instituted in the Stipulation also is to prevent discrimination, but on the basis of *either* race *or* religion. (¶ 4) There any similarity with so-called "race-conscious" remedies ends. In fact, the Stipulation is painstakingly race- and

religion-neutral. With the exception of the provisions governing placements in "specially designated" agencies (¶ 61), and foster boarding home (¶ 25), both of which *preserve* the *status quo* rather than altering it, the Stipulation authorizes *no* differential treatment of children on the basis of race or religion, and indeed expressly *prohibits* such treatment. *See, e.g., id.* at ¶¶ 5, 70.

Defendants argue, however, that implementation of the Stipulation will have the *effect* of "displac[ing] Jewish and Catholic children from care [by Jewish and Catholic agencies]," thereby causing "reverse discrimination" against those children. Objectors' Brief at 31 & 33. Here the "logic" of defendants' "race-conscious remedy" argument emerges and, simultaneously, self-destructs. Defendants can only maintain that a neutral, "first-come, first-served" placement scheme will have a discriminatory impact on Catholic and Jewish children if they heretofore have enjoyed *preferences* in placement that threaten to be eliminated or circumscribed under the Stipulation. If that is the case, then it is the *present* child placement system that is religion-conscious, and not the scheme envisioned under the Stipulation.[21]

Inasmuch as defendants fail to persuade the Court that the Stipulation represents a "race-conscious remedy," it is unnecessary to consider defendants' further argument that, under *Kirkland*, plaintiffs have failed to make out a *prima facie* case of discrimination that would support such a remedy. A few comments nevertheless are in order. First, it is not at all clear that, assuming the proposed settlement *could* properly be characterized as "race-conscious," plaintiffs would be required to make a *prima facie* showing of discrimination in order for the Stipulation to be approved. The Second Circuit panel in *Kirkland* noted that the Sixth and Eighth Circuits, to which it had cited approvingly, have held that "a statistical imbalance falling short of a *prima facie* case is sufficient to constitute a proper basis for settlement." 711 F.2d at 1130 n. 15. In *Bushey, supra,* a different panel of the Circuit held, consistent with *Kirkland,* that a *prima facie* showing of disproportionate racial impact can serve as a basis for voluntary, race-conscious remedies, but suggested that this was not the sole means of justifying race-conscious relief. *Kirkland,* the *Bushey* panel emphasized, "only requires [that there be] 'a sufficiently serious claim of discrimination.'" 733 F.2d at 226 n. 7 (quoting *Kirkland, supra,* 711 F.2d at 1130).

On the other hand, it is arguable that the Court should require *some* showing by plaintiffs relevant to the merits of their underlying claims in view of the nature of the remedy proposed in the settlement. The Stipulation, although race- and religion-neutral, contemplates significant system-wide changes in the administration of New York City foster care, and therefore undeniably "contains ... relief affecting third parties." *Kirkland, supra,* 711 F.2d at 1130. The far-reaching impact of the proposed settlement clearly requires this Court to consider its impact on the nonparties affected. Moreover, the fact that a substantial number of religious agencies do not consent to the Stipulation, although they would effectively be required to comply with its terms if they continued to contract with the City, *see supra* at 1319–20, impels the Court to consider care-

---

**21.** Defendants' suggestion that the Stipulation would result in reverse discrimination against Catholic and Jewish children fails for similar reasons. In *Regents of the University of Calif. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), on which defendants principally rely, Justice Powell, announcing the judgment of the Court, explicitly distinguished between the "purposeful, acknowledged use of racial criteria" in the medical school admissions program challenged there, and "[a] classification [that] on its face is racially neutral, but has a disproportionate racial impact." 438 U.S. at 289 n. 27, 98 S.Ct. at 2747, n. 27. In the latter situation, Justice Powell observed, discrimination could not be presumed, but would require a showing of *intent* to discriminate. Inasmuch as defendants here hinge their "reverse discrimination" argument on the anticipated adverse *impact* of the Stipulation's facially *neutral* placement provisions, their argument cannot succeed.

fully their objections. These inquiries go primarily to the fairness of the Stipulation, and touch only tangentially on the merits of plaintiffs' underlying claims. *See infra* at 1342–53. Assuming, however, that it is also appropriate to require the Stipulation's proponents to make some showing on the merits—for example, that plaintiffs have asserted a "serious claim of discrimination" or that there is "a reasonable basis for the compromise," *Kirkland, supra,* 711 F.2d at 1130—the Court is satisfied that an adequate showing has been made.

In their submissions supporting the original settlement proposal and the revised Stipulation, plaintiffs summarized the evidence they had gathered over approximately ten years of discovery and that they would have used at trial. *See* Plaintiffs' Memorandum in Support of Proposed Settlement ("Plaintiffs' First Memorandum") at 3–20; Plaintiffs' Second Memorandum at 14–21; *see also* Affidavit of Marcia Robinson Lowry (sworn to Aug. 3, 1984) (annexing copies of Michelson, "Children Receiving Out-of-Home Services in New York City: Allocation by Race and Religion" (Econometric Research, Inc., Wash. D.C., July 26, 1983) ("Michelson Report"), and *The Minority Foster Child, supra*). Plaintiffs' evidence falls into several broad categories:

1. Statistical studies of children in New York City foster care, including most recently the Michelson Report, *supra,* which was done at the behest of the American Civil Liberties Union, plaintiffs' counsel in this case, and *The Minority Foster Child, supra,* which is the culmination of research done at Fordham University's Hispanic Research Center under a grant from the National Institute of Mental Health. Both studies purport to demonstrate, *inter alia,* that black, non-Catholic and non-Jewish children are disproportionately placed in child care agencies (or programs within child care agencies) of arguably lower quality. *See* Michelson Report at 4–6; *The Minority Foster Child* at 55–58.

2. *Redirecting Foster Care, supra,* the Report of the Mayor's Task Force on Foster Care Services issued in June 1980. The report found, among other things, that there was a pattern of *de facto* segregation in New York City's child welfare services. *Id.* at 68.

3. Deposition testimony of SSC administrators and caseworkers and Family Court officials regarding Catholic and Jewish child care agencies' preferential acceptance of children of their own religion, and agencies' more willing acceptance of white children.

4. Deposition testimony and interrogatory answers of religious agency officials concerning preferences given to children of their own religion.

5. Generally undisputed characteristics of present child placement system that would facilitate discrimination on the basis of race and/or religion, including SSC's identification of children awaiting placement by race and religion, loose agency intake criteria, and SSC reimbursement of agencies for children accepted directly by the agencies rather than through SSC placement procedures.

In addition, the Court considers significant the determination made by the City defendants on the eve of trial in 1983 that "the statistics could be interpreted as demonstrating that plaintiff class children are disproportionately concentrated in (i) agencies other than the defendant agencies, and (ii) in agencies that are arguably of lower quality." Affidavit of Frederick A.O. Schwarz, Jr., Corporation Counsel, at ¶ 21 (sworn to July 6, 1984). For this and other reasons, the City defendants decided in late 1983 that it was in their interests to attempt to settle the claims against them, "avoid[ing] the risk of an adverse finding in that respect." *Id.* Although the averment of the Corporation Counsel does not constitute an admission of liability, it bears directly on the issue of whether there is "a reasonable basis for the compromise," *Kirkland, supra,* 711 F.2d at 1130. The Corporation Counsel's statements carry particular weight when one considers that the City defendants have had perhaps the broadest access of any parties to informa-

tion concerning the actual operation of the New York City child care system, and that they had vigorously contested their liability until 1983.

Finally, the Court notes the objecting agencies' response to the settlement proposal and to the evidence plaintiffs offered to demonstrate that there is a reasonable basis for the compromise. Defendants have conceded that, while plaintiffs' allegations of discrimination remain unproven, defendants considered their "import ... serious enough to have prompted us during the hearings [held in August 1984] to state that our clients were prepared to join in a consent decree with all other parties proscribing discrimination on the basis of either race or religion." Objectors' Brief at 20. Effectively conceding that plaintiffs have at least asserted a "serious claim of discrimination," *Kirkland, supra,* 711 F.2d at 1130, defendants nonetheless argue that plaintiffs' statistics are inadequate to justify the Court's approval of the settlement now proposed.

Defendants contend, first, that statistics are inadequate because they do not prove defendants' intent to discriminate. Defendants ignore, however, that plaintiffs are attempting to settle this case, not to prove it at a trial on the merits. Even where this Circuit has required plaintiffs to make a *prima facie* showing of discrimination to establish the propriety of a "race-conscious" Title VII settlement, it has required nothing *more* than a showing of disproportionate impact. *See, e.g., Bushey, supra; Kirkland, supra.* Defendants argue, second, that plaintiffs' statistics are faulty because those who conducted the studies have not "appeared ... in support of the proposed settlement," and because their analyses do not account for such factors as parental preferences for reli-

gious placement and the particular needs of individual children. Objectors' Brief at 26–28. These issues, however, are properly the subject of cross-examination and rebuttal. Had the parties proceeded to trial, defendants would have had the opportunity to cross-examine plaintiffs' statistical expert(s) concerning their methodologies, and would undoubtedly have offered their own studies and expert(s) to rebut the inferences that could be drawn from plaintiffs' evidence.

In the context of Title VII class actions, the Second Circuit has emphasized that the proponents of a class settlement or voluntary affirmative action plan are not required to prove that their *prima facie* case is irrebuttable. *See Bushey, supra,* 733 F.2d at 226–28; *Kirkland, supra,* 711 F.2d at 1129–30. Here, where the Court has held that plaintiffs are not even required to establish a *prima facie* case, plaintiffs surely are not obligated to account for all the possible factors other than race and religion that could explain the results obtained in the studies on which they rely. The Court would note, however, that the two studies on which plaintiffs principally rely do purport to account for at least some of the additional factors cited by defendants. The Michelson Report, *supra,* claims to have taken account of parents' preferences for religious placements. *See id.* at 5–6, 57–63. The study done by the Hispanic Research Center at Fordham does not appear to have considered parents' religious preferences as a separate factor, but does claim to have taken account of "entry-level characteristics" such as age, incidence of serious disabilities, and history of serious family disruptions. *See The Minority Foster Child, supra,* at 56.[22]

---

**22.** Defendants argue that plaintiffs cannot establish the propriety of the proposed settlement through statistics. They nevertheless offer their own figures to disprove both the propriety of the Stipulation *and* their underlying liability. *See* Objectors' Brief at 28 n.*; Supplemental Submission By Certain Objectors. Defendants' "statistics," however, relate only to the racial and religious composition *within all* Catholic agency programs and *all* Jewish agency programs. The figures do not offer any comparison with the racial and religious composition of the entire New York City foster care system. Furthermore, defendants' figures do not rebut plaintiffs' claim of racial and religious segregation *within* religious agencies, nor do they respond in any way to plaintiffs' claims based on the Free Exercise and Establishment Clauses.

**1324**

### E. *"The Law of the Case"*

The objecting defendants also attack the Stipulation's "first-come, first-served" principle of placement on the ground that it violates New York's religious matching statutes as upheld by the three-judge court in *Wilder I.* It will be recalled that the statutes in question require that, in placing a child in a state-authorized child care institution, the responsible public agency "so far as consistent with the best interests of the child, and where practicable, ... give effect to the religious wishes of [one or both parents]." N.Y.Soc.Serv.Law § 373(7); *see also* N.Y. Fam.Ct.Act § 116(g). In *Wilder I*, it will also be recalled, the three-judge court upheld these statutes on their face as "a fair and reasonable accommodation between the Establishment and Free Exercise Clauses of the [federal] Constitution," assuming that the statutes in operation were not "used to favor one or more religion[s] over others or even to favor religion as against the absence of religion." 385 F.Supp. at 1029 & 1028.

The precise nature of defendants' objection here is unclear. Defendants generally challenge the placement provisions of the Stipulation on the ground that they operate to "reduce" religion to the status of just one of many factors to be taken into account in placing a child with a state-authorized agency. (H.T. 965) Defendants also seem troubled by the Stipulation's assumption that it is not "practicable" to place a child in a particular religious agency or program if there is no vacancy—or if there is a waiting list—for that agency or program. *See, e.g.*, ¶¶ 23, 24, 28. Neither objection raises a serious legal challenge, however.

Notwithstanding the general principle of "equal access to available quality services [without regard to] a child's race or religion" (¶ 5), the proposed settlement requires that SSC place a child in the best available "in-religion" program assuming three conditions are met: (1) the parent has expressed a wish for an in-religion placement; (2) such a placement is determined by SSC to be "in the best interests of the child"; and (3) such placement is "practicable." *E.g.*, ¶¶ 23, 24, 28, 30. These placement provisions are entirely consistent with the language of the religious matching statutes which, as amended in 1970, require a particular religious placement in order "to give effect to [a parent's] religious wishes," but only "where practicable" and "consistent with the [child's] best interests." The statutes, as interpreted by the New York Court of Appeals in a case involving adoption placements, "place[ ] primary emphasis on the temporal best interests of the child, although the religious preference of the natural parents remains a relevant consideration." *In re Dickens v. Ernesto,* 30 N.Y.2d 61, 66, 281 N.E.2d 153, 155, 330 N.Y.S.2d 346, 348, *appeal dismissed for want of substantial federal question,* 407 U.S. 917 92 S.Ct. 2463, 32 L.Ed.2d 803 (1972). Under the statutes, the state court held, "religion is but one of many factors in the placement of a child" and a religious placement, "though desirable, is not mandatory." *Id.* While the three-judge panel in *Wilder I* upheld the same statutes on their face under a different analysis, it acknowledged that "[a] clearer statement by the highest state court of the permissive nature of the statute can scarcely be imagined." 385 F.Supp. at 1022.

Viewed against this background, defendants' charges that the Stipulation violates state law or the holding of the three-judge panel in *Wilder I* are simply unfounded. To the extent the Stipulation "reduces" religion to one of many factors relevant in the placement of a child, that is entirely consistent with the Court of Appeals' construction of the relevant statutes in *In re Dickens, supra.* In fact, however, the Stipulation *requires* that a parent's wish for a particular religious placement be honored unless it would be detrimental to the child or unless there is not an available opening in that program. Even then, the parent has various options, including having the child placed in the next best available in-religion program. *See* ¶¶ 23, 24, 28, 30.

Nor does the Stipulation's use of the word "practicable" conflict with the language or import of the religious matching provisions. As the Court of Appeals observed in *Dickens,* the phrase "where practicable" has been interpreted broadly by the New York courts to give discretion to responsible government officials in making placement decisions. *See In re Dickens, supra,* 30 N.Y.2d at 64, 281 N.E.2d at 154–55, 330 N.Y.S.2d at 347. Furthermore, the court in *Wilder I* upheld the religious matching provisions based on several assumptions, one of which was that those provisions were not being "used to favor one or more religion[s] over others or even to favor religion as against the absence of religion." 385 F.Supp. at 1028. In light of the judicial interpretations and assumptions surrounding the state statutes in question, the Court sees no clear legal infirmity in the Stipulation's provision that a particular placement will not be "practicable" if there is no vacancy in the program or if there is a waiting list consisting of children who have at least the same need for the agency's services.

### F. *Free Exercise*

The objecting agency defendants attack numerous provisions of the Stipulation on the ground that they violate the Free Exercise Clause of the First Amendment. The Court has examined these provisions in light of their objections, but finds no obvious Free Exercise violation therein.

Among the provisions defendants attack on Free Exercise grounds are those pertaining to placement on a first-come, first-served basis, *e.g.,* ¶ 19, the information to be given parents regarding in-religion placements (¶ 57), determinations by SSC that certain agencies or programs will be "specially designated" to care solely for children of a particular religion (¶ 61), and measures that are to be taken by the agencies to ensure the free exercise rights of children in their care (¶ 70). One strains to find the common Free Exercise theory on which defendants challenge all of these terms. Two themes run through defendants' arguments. One is that "[a]t the

moment, and for over a century ..., New York families in need have had the unfettered ability to choose a home under religious auspices because of both the federal and State constitutions and statutes and also the voluntary efforts of the City's federations, Catholic, Protestant and Jewish." Objectors' Brief at 36. Another is that any governmental attempts to regulate the religious activities of sectarian child care agencies—beyond the extent of present state regulations—would be unconstitutional. *See id.* at 41–42. These premises must be examined in light of general principles of First Amendment law.

As a preliminary matter, it bears repeating that the Free Exercise rights defendants assert here are those of the children in foster care and their parents, not the religious agencies themselves. (H.T. 937) Beyond question, "[t]he First Amendment guarantees that all are free to believe and free to act in the exercise of their religious convictions." *Catholic High School Ass'n of the Archdiocese of New York v. Culvert,* 753 F.2d 1161, 1169 (2d Cir.1985). A distinction must be drawn, however, between the freedom to believe, which is absolute, and the freedom to act, which is not. *Id.; see Bowen v. Roy,* —— U.S. ——, 106 S.Ct. 2147, 2151, 90 L.Ed.2d 735 (1986); *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903–04, 84 L.Ed. 1213 (1940). Notwithstanding that one's right to engage in particular religious conduct is limited rather than absolute, the First Amendment prohibits government from acting or regulating private conduct in a way that burdens religious exercise unless the government regulation is "essential to accomplish an overriding governmental interest," *United States v. Lee,* 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055–56, 71 L.Ed.2d 127 (1982), or represents "the least restrictive means of achieving some compelling state interest," *Thomas v. Review Bd. of Indiana Empl. Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). *See also Wisconsin v. Yoder,* 406 U.S. 205, 214–15, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 406–07, 83 S.Ct. 1790, 1795–96, 10

L.Ed.2d 965 (1963); *Culvert, supra,* 753 F.2d at 1169.

 With this background, the Court returns to defendants' assertions regarding the Free Exercise rights of children in foster care. Under the principles set forth above, it is highly questionable that the First Amendment guarantees New York families "the unfettered ability to choose a [child care program] under religious auspices." Clearly, a family's or child's right to adhere to particular religious beliefs must be "unfettered" under the First Amendment. A parent's right to have his or her child placed in a child care program of a particular religious orientation is not. To establish that the Free Exercise Clause mandates such a religious placement, a parent would have to show that any other placement would unconstitutionally burden the child's religious exercise; even then, however, an alternative placement would be permissible if it represented the least restrictive means of achieving some compelling state interest. *Thomas, supra,* 450 U.S. at 718, 101 S.Ct. at 1432; *see also Culvert, supra,* 753 F.2d at 1169.

Defendants do not maintain that the Free Exercise rights of most children in foster care can only be protected by agencies of the same religious affiliation.[23] If that were the case, the First Amendment rights of a substantial number of New York City children would be in jeopardy, since it is undisputed that there are no child care agencies or programs operating in New York City that are affiliated with the particular Protestant denominations, Muslim sects and many other religious groups represented in the child care population. Instead, state regulations require all agencies—religiously affiliated, nonsectarian and public—to make appropriate provisions for the religious training and observance of all children in their care in accordance with the wishes of the children's parents or legal guardians. *See* 18 N.Y.C.R.R. § 441.11; Objectors' Brief at 40–41. Defendants also do not argue explicitly that the Free Exercise Clause guarantees a child from a particular religious background placement in the *best*-quality program of the same religious orientation. Indeed, defendants would be hard put to make such an argument since they themselves oppose other aspects of the Stipulation on the ground that *no* child has the constitutional right to the *best* child care services. *See* Objector's Brief at 52–56.[24] The law should certainly be no different where religious affiliation is involved. What, then, are the Free Exercise infirmities in the Stipulation? The Court will examine the provisions defendants specifically challenge in this regard.

### 1. *"First-Come, First-Served"*

 Defendants' first Free Exercise objection is to the general placement of children on a "first-come, first-served" basis. The Free Exercise defect in such a system is not immediately apparent. Arguably, the religious exercise of children from pervasively religious backgrounds would be threatened under a system that could not assure them placement in a foster care setting equipped to accomodate their religious beliefs and practices. However, the Stipulation explicitly excepts such children

---

**23.** The Stipulation of course, makes special provision for children from pervasively religious backgrounds. (¶¶ 21, 61). Although they object to the procedures established for identifying "specially designated agencies" to care for such children (¶ 61), defendants do not appear to dispute the underlying assumption, that *some* children's religious beliefs and practices are so pervasive that their Free Exercise rights can adequately be protected only in an agency or program of the same religion.

**24.** The proponents of the Stipulation, by the way, do not dispute defendants' underlying posi-

tion. (H.T. 1016–20) Plaintiffs do maintain, however, that there is a constitutional right to *equal access* to the best child care services. (H.T. 1016–17) Even if there is no such constitutional guarantee, it would not preclude the Court from approving the "equal access" provisions of the Stipulation. As stated earlier, the Court's power to approve the terms of a settlement or consent decree is broader than it would be to fashion its own injunctive remedy after a trial on the merits. *See Cleveland Firefighters, supra,* 106 S.Ct. at 3076–79.

from the operation of the "first-come, first-served" rule (¶ 21), and provides a procedure by which SSC would designate particular agencies to care exclusively for such children (¶ 61).

With regard to children from less pervasive religious traditions, defendants maintain that the religious needs of these children can *better* be served by persons of the same religion. Objectors' Brief at 40. Defendants concede, however, that even where those religious needs are paramount, they can usually be met in another care setting. *Id.* at 37–38. It is therefore difficult to see how the Stipulation's placement scheme impermissibly burdens the religious exercise of children from nonpervasive religious backgrounds. In fact, the Stipulation reflects in several of its provisions the recognition that a particular child's religious needs may best be met in a child care program of the same religion. *See, e.g.,* ¶¶ 23, 24, 28, 30 (child whose parent expresses wish for in-religion placement *must* be placed in best in-religion program as long as it is in child's best interest and is practicable); ¶ 25 (agency may consider child's religion among factors in matching child with individual foster family).

Arguably there are circumstances in which the Stipulation might operate to incidentally burden some children's Free Exercise rights. Consider, for example, the case in which a parent has expressed a religious preference, there is no opening available in the best in-religion program, and the parent chooses to place his or her child in the best out-of-religion program. One likely result of such a placement would be that the child would attend religious services outside of the agency rather than on its premises, arguably an inconvenience or "burden" on the child's religious exercise. Assuming the child care agency were meeting its state-imposed obligation to provide for the child's religious education and observance, however, such minor impositions on a child's religious practice hardly suggest a burden of constitutional magnitude. Moreover, even if a child's religious exercise were burdened somewhat by an out-of-religion placement, the Stipulation's

placement provisions can fairly be viewed as a less restrictive means of achieving the City's legitimate and compelling interest in providing access to appropriate child care programs for all children ,regardless of race or religion. *See Thomas, supra,* 450 U.S. at 718, 101 S.Ct. at 1432.

### 2. *"Drop-Down"*

Defendants also raise a Free Exercise objection to the so-called "drop-down" provisions of the Stipulation, under which a parent who has expressed a preference for an in-religion placement may choose—where a space is not available in the *best* in-religion program for the child's needs—to place the child on a waiting list for that program, to place the child in the next-best available in-religion program, or to place the child in the best available out-of-religion program. *See* ¶¶ 23, 24, 28, 30; *see also* ¶¶ 56–58. Clearly, there can be no *constitutional* violation in making such choices available to a parent unless one assumes *both* that the child has a First Amendment right to be placed in a program affiliated with his or her religion *and* that the child has the constitutional right to be placed in the *best* in-religion program. Then, it could be argued, by "forcing" the parent to choose one of the options available, the Stipulation would be "putting substantial pressure on [the parent] to modify his behavior and to violate his beliefs." *Thomas, supra,* 450 U.S. at 718, 101 S.Ct. at 1432. It has already been established above, however, that neither assumption about the extent of parents' and children's Free Exercise rights is valid. Defendants' First Amendment objection to the parental preference provisions of the Stipulation therefore cannot stand.

### 3. *"Specially Designated" Agencies*

 The objecting agencies challenge the provisions regarding "specially designated" agencies (¶ 61) on both First Amendment and Equal Protection grounds. Their First Amendment argument—that SSC's task of determining which agencies are to be "specially designated" would "entangle[ ] government in the unconstitution-

al task of passing on degrees of religious orthodoxy," Objectors' Brief at 39 n. * * —is more properly treated as an Establishment Clause rather than a Free Exercise objection. *See infra* at 1330. Viewed under either of the Religion Clauses, however, defendants' argument is not persuasive. In *Wisconsin v. Yoder, supra,* on which defendants rely, the lower courts and the Supreme Court addressed the same "delicate question" SSC would face under ¶ 61, namely, determining "what is a 'religious' belief or practice entitled to constitutional protection." 406 U.S. at 215, 92 S.Ct. at 1533. In *Yoder,* the Supreme Court concluded that "strong evidence of a sustained faith pervading and regulating respondents' entire mode of life support the claim that enforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger if not destroy the free exercise of respondents' religious beliefs." *Id.* at 219, 92 S.Ct. at 1535. Paragraph 61 of the Stipulation essentially requires SSC to examine religious agencies and programs under the standard for Free Exercise protection articulated in *Yoder.* Clearly, that is permissible under the First Amendment.[25]

Defendants' Equal Protection argument requires even briefer comment. The classification of "specially designated" agencies under ¶ 61—drawn as it is from the Supreme Court's language in *Yoder, supra* —is reasonably related to the underlying governmental purpose, namely, protection of the Free Exercise rights of children who come from pervasively religious backgrounds. *See McGowan v. Maryland,* 366 U.S. 420, 425–28, 81 S.Ct. 1101, 1104–06, 6 L.Ed.2d 393 (1961). Moreover, even assuming the classification required strict scrutiny inasmuch as it differentiates between types of religious practice and implicates the Free Exercise rights of children in foster care, *see United States v. Carolene Products Co.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938),

it would not run afoul of the Equal Protection Clause. Assuming that the religious exercise of other children in foster care is adequately protected by other means, SSC's interest in protecting the Free Exercise rights of children from pervasive religious cultures is sufficiently compelling to justify their differential treatment under ¶ 61.

#### 4. *"Religious Practices"*

■ The objecting defendants' Free Exercise attack on the "religious practices" provisions of the Stipulation is most bewildering. Assuming that the First Amendment rights with which the agencies are concerned are those of the children in their care, *see supra* at 1325–26, it is difficult to conceive how those rights are jeopardized or infringed by "policies and practices [intended to] ensure the free exercise rights of all children in placement." (¶ 70) Certainly, requiring an agency to "provide comparable opportunities for children to practice their religion" (¶ 70(1)), and precluding agencies from either compelling or prohibiting a child's participation in religious activities on the agency premises (¶ 70(2), (4)), should not infringe the religious exercise of other children.

Defendants' particular objection to the provision governing access to family planning information and services (¶ 70(7)) is most difficult to fathom. The provision expressly states that *SSC* is to be responsible for ensuring access to family planning information, services and counseling, and that it is "to be provided either by the agency or by a suitable outside source or both." Thus, even assuming an agency's employees objected on religious grounds to, for example, counseling children about the use of birth control, that would not pose a Free Exercise problem for the employee under the Stipulation because SSC is authorized to provide counseling outside the agency.[26]

**25.** The Court considers the general question of government "entanglement" in the operation of religious child care agencies below. *See infra* at 1329–39.

**26.** To the extent defendants also object to ¶ 70(7) on the ground that New York City children in foster care are not entitled in appropriate circumstances to obtain family planning ser-

At the March 4, 1985 hearing, the Court raised on its own a possible constitutional objection to ¶ 70(9), which provides in part that "[a]gencies shall not display *excessive* religious symbols" (emphasis added). The Court was troubled, first of all, by the vagueness of the term "excessive." Second, the Court anticipated that enforcement would be problematic because it could conceivably go beyond a legitimate inquiry into whether a particular symbol was part of a system of religious beliefs, into questions about the validity or significance of the symbol within that religious tradition. *See United States v. Seeger,* 380 U.S. 163, 184–85, 85 S.Ct. 850, 863–64, 13 L.Ed.2d 733 (1965).

At the hearing, the proponents of the Stipulation explained that ¶ 70(9) was the product of compromise, and was designed to ensure that the Free Exercise rights of children with a different religious orientation were not chilled by a particularly overbearing display of religious symbols in an agency's common areas. (H.T. 1004–05) In a supplemental submission, plaintiffs' counsel referred the Court to First Amendment cases in which the Supreme Court has emphasized the susceptibility of children to religious indoctrination and peer pressure. *See* Letter of Marcia Robinson Lowry to the Court (dated March 8, 1985) (citing, *inter alia, Marsh v. Chambers,* 463 U.S. 783, 792, 103 S.Ct. 3330, 3336, 77 L.Ed.2d 1019 (1983); *Tilton v. Richardson,* 403 U.S. 672, 685–86, 91 S.Ct. 2091, 2099–2100, 29 L.Ed.2d 790 (1971); *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 287–93, 83 S.Ct. 1560, 1605–09, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring)). *See also Grand Rapids, supra,* 105 S.Ct. at 3222–24.

Plainly, the purpose underlying ¶ 70(9), as stated by the proponents of the settlement, is legitimate. Moreover, the religious agencies—which object strenuously to other aspects of ¶ 70—did not originally voice any objection to this particular provision. (H.T. 1010, 1014) This Court's task, of course, is not to approve only those settlement terms with which it agrees, or that are drafted to its liking. Nor is it productive to speculate broadly about the possible ramifications of each settlement term. If the provision is fair and reasonable, and does not authorize clearly illegal conduct, it should be approved. *See Robertson, supra,* 556 F.2d at 686. Paragraph 70(9), while ambiguous and not necessarily susceptible of easy enforcement, is intended to serve a legitimate purpose and does not clearly advance an illegitimate one. The Court therefore will not withhold approval of the term on legal grounds. Approval is conditioned, however, on an understanding that ¶ 70(9) would be subject to enforcement by this Court pursuant to ¶ 75 of the Stipulation only where plaintiffs can demonstrate that a religious symbol or aggregation of symbols displayed in the common areas of a child care agency has the effect of impermissibly chilling the Free Exercise rights of children in the agency's care.

### G. *Establishment of Religion*

█ After the March 4, 1985 hearing, and before the signed Stipulation had been presented to the Court for final approval, the Supreme Court issued two decisions upholding Establishment Clause attacks on publicly funded educational programs for nonpublic school students, *Grand Rapids, supra,* and *Aguilar v. Felton,* —— U.S. ——, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). Because of the arguable relevance of the

---

vices (including abortions, as provided for by state regulations), either through an agency or from an outside source arranged by SSC, their objection has no basis either in constitutional law or in federal or state statutes. *See Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. 52, 74–75, 96 S.Ct. 2831, 2843–44, 49 L.Ed.2d 788 (1976); *see also Planned Parenthood Ass'n of Kansas City v. Ashcroft,* 462 U.S. 476, 490–93 & 505, 103 S.Ct. 2517, 2524–26, 2532, 76 L.Ed.2d

733 (1983) (Powell, J., announcing judgment of Court; O'Connor, J., concurring in judgment in part and dissenting in part); *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 74–75 n. 30, 103 S.Ct. 2875, 2884–85, n. 30, 77 L.Ed.2d 469 (1983); *Lady Jane v. Maher,* 420 F.Supp. 318, 321 (D.Conn.1976), *aff'd sub nom. Maloney v. Lady Jane,* 431 U.S. 926, 97 S.Ct. 2628, 53 L.Ed.2d 242 (1977). *See* 42 U.S.C. § 602(a)(15); N.Y.Soc.Serv.Law § 365–a(3)(c).

cases to the Establishment Clause claims raised in both *Wilder v. Sugarman* and *Wilder v. Bernstein,* the Court requested supplemental briefs from the parties on the impact, if any, of these recent Supreme Court decisions on the legality of the proposed settlement. A summary of the facts of those cases is helpful to the discussion that follows.

In *Grand Rapids* and *Aguilar,* the Supreme Court struck down on Establishment Clause grounds a variety of publicly funded programs aiding nonpublic schools. *Grand Rapids* involved two state-funded programs in Grand Rapids, Michigan for providing classes to nonpublic school students on nonpublic school premises. Grand Rapids' "Shared Time" program provided public school teachers to teach "remedial" and "enrichment" courses to nonpublic school students during the regular school day. Its "Community Education" program funded classes held on nonpublic school premises *after* the regular school day and usually taught by instructors already employed full-time by the nonpublic schools. 105 S.Ct. at 3218–20. The programs challenged in *Aguilar,* in contrast, provided remedial classes and guidance services to New York City parochial school students on the school premises with federal funds made available under Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 2701 *et seq.* The classes and services were provided by regular public school teachers who had volunteered to teach in the parochial schools, and were held on parochial school premises. The program was administered by the City's Bureau of Nonpublic School Reimbursement, which established guidelines and required periodic visits by field supervisors to guard against "involvement with religious activities that are conducted within the private schools." 105 S.Ct. at 3235.

In both cases, the Supreme Court struck the publicly funded programs under the three-part test summarized in *Lemon v. Kurtzman, supra.* Specifically, the Court found the Grand Rapids programs constitutionally vulnerable under the second prong of the *Lemon* test, in that they had the

principal or primary effect of advancing religion. 105 S.Ct. at 3230; *see Lemon, supra,* 403 U.S. at 612, 91 S.Ct. at 2111. New York City's Title I program, on the other hand, failed because the pervasive monitoring of the program conducted by New York City officials to guard against the infiltration of religion into the Title I classes led to excessive entanglement of church and state under prong three of the *Lemon* test. 105 S.Ct. at 3239; *see Lemon, supra,* 403 U.S. at 613, 91 S.Ct. at 2111.

The two cases can arguably be distinguished from *Wilder* on their facts, as simply the latest in a narrow line of cases involving state aid to nonpublic schools. Nonetheless, certain aspects of the Supreme Court's analysis in the two opinions arguably reflected on features of the settlement proposed here, therefore prompting the Court's interest and concern. In *Grand Rapids,* for example, the Supreme Court concluded that the two school funding programs at issue effectively promoted religion in three ways:

> The state-paid instructors, influenced by the pervasively sectarian nature of the religious schools in which they work, may subtly or overtly indoctrinate the students in particular religious tenets at public expense. The symbolic union of church and state inherent in the provision of secular, state-provided instruction in the religious school buildings threatens to convey a message of state support for religion to students and to the general public. Finally, the programs in effect subsidize the religious functions of the parochial schools by taking over a substantial portion of their responsibility for teaching secular subjects.

105 S.Ct. at 3230. Noteworthy in *Aguilar* was the Court's identification of the aspects of New York City's monitoring system that resulted in unconstitutional entanglement:

> Agents of the State must visit and inspect the religious school regularly, alert for the subtle or overt presence of religious matter in Title I classes. In addi-

tion, the religious school must obey these same agents when they make determinations as to what is and what is not a "religious symbol" and thus off limits in a Title I classroom. In short, the religious school, which has as a primary purpose the advancement and preservation of a particular religion must endure the ongoing presence of state personnel whose primary purpose is to monitor teachers and students in an attempt to guard against the infiltration of religious thought.... Administrative personnel of the public and parochial school systems must work together in resolving matters related to schedules, classroom assignments, problems that arise in the implementation of the program, requests for additional services, and the dissemination of information regarding the program. Furthermore, the program necessitates "frequent contacts between the regular and the remedial teachers (or other professionals), in which each side reports on individual student needs, problems encountered, and results achieved."

105 S.Ct. at 3238 (citations omitted).

The positions taken by the parties in their submissions on the significance of *Grand Rapids* and *Aguilar,* while not entirely predictable, were consistent with their general postures in this litigation. The City defendants, State defendants, defendant Kaufman and the intervenors argued that the recent cases have no effect on the legality of the Stipulation, because they announce no change in the *Lemon v. Kurtzman* analysis employed by the three-judge court in *Wilder I,* but merely apply that test in the factually distinguishable area of government aid to nonpublic schools. Plaintiffs agreed that neither *Grand Rapids* nor *Aguilar* makes new law in the Establishment Clause area. They suggested, however, that both cases highlight the constitutional infirmities in New York's *present* system of foster care, specifically, the public funding of pervasively sectarian child care institutions and the entanglement that results from government's attempts to limit aid to religion. The objecting defendants agreed that *Aguilar*

and *Grand Rapids* are factually distinguishable from the instant case. They argued nonetheless that the cases confirm the illegality of the proposed settlement, which would in their view impose an "extensive bureaucratic, state-controlled overlay upon the existing foster care system," thus "upsetting the finely-tuned accomodation of the religion clauses found by the three-judge Court in *Wilder I.*" Supplemental Brief in Further Opposition to Proposed Settlement ("Objectors' Supplemental Brief") at 2 & 14.

The Court has considered carefully the terms of the proposed settlement in light of the arguments made by the respective parties in their supplemental submissions. As the three-judge panel itself acknowledged in *Wilder I,* New York's substantial reliance on religiously affiliated agencies and institutions to provide foster care services to children in need raises serious Establishment Clause concerns. *See* 385 F.Supp. at 1024. It is reasonable to expect, then, that any attempted resolution of the intersecting constitutional and state law issues in this litigation would present similar concerns. Both plaintiffs and the objecting defendants raise valid questions about the legality of, respectively, New York City's present foster care system and the changes contemplated for it under the Stipulation. The Court is not persuaded, however, that the proposed settlement clearly violates the Establishment Clause when all relevant constitutional interests are taken into account.

In *Wilder I,* it will be recalled, the three-judge court applied the *Lemon v. Kurtzman* test to the New York religious matching and child care funding statutes challenged there as violative of the Establishment Clause. The panel concluded with little difficulty, under prong one of the *Lemon* test, that the New York statutes in question did *not* have a secular purpose, and under prong two of *Lemon,* that their effect could be to impermissibly inculcate religion. 385 F.Supp. at 1024. The court did not expressly reach part three of the *Lemon* test, which considers "excessive

**1332**

government entanglement with religion," 403 U.S. at 613, 91 S.Ct. at 2111, presumably because it had already found the statutes "violative of the literal language of the Establishment Clause" under *Lemon's* first two prongs. *See* 385 F.Supp. at 1024. Nonetheless, the court upheld the state statutory scheme on its face in view of "countervailing circumstances," namely, the "implementation of other equally important provisions of the Constitution," more specifically, the Free Exercise Clause. *See id.* at 1024 & 1029.

It is important to keep in mind that the facial validity of the New York child care statutes as found by the three-judge panel rested on several unproven assumptions. Among other things, the court assumed (1) that the statutes were not being used to favor one or more religions over another or religion over an absence of religion; (2) that the public funds paid to religious child care institutions were being used "primarily, if not entirely, for the foster children's temporal needs"; and (3) that if the state were required to provide for the religious needs of children in a strictly secular setting, it "would be hopelessly entangled in religion," beyond its existing relationship with child care institutions and foster parents who provide themselves for the children's religious observance and training. *Id.* at 1028–29.

Were this Court writing on its own clean slate, it is not clear that it would make the same assumptions about the New York child care system as did the three-judge panel. For example, it is not obvious to the Court that the "entanglement" involved in providing for the religious needs of children in foster care is necessarily greater where the state cares for children in its own facilities than when it places children in private agencies, some of which are religiously affiliated but almost all of which

service children of different religious backgrounds. In the absence of a complete factual record from which to make findings about the actual operation of the child care system hypothesized in *Wilder I*, however, this Court is bound by the three-judge panel's decision under the doctrine of *stare decisis.*[27]

*Stare decisis* principles would not, of course, preclude the Court from reexamining the facial question resolved in *Wilder I* if in the interim there had been clear changes in the law on which the three-judge court premised its conclusions. In this regard, the Court agrees with the parties that neither *Grand Rapids* nor *Aguilar* signals a substantive change in the Establishment Clause standard employed by the three-judge panel. Indeed, Justice Brennan expressly reaffirmed the viability of the *Lemon v. Kurtzman* test in *Grand Rapids, see* 105 S.Ct. at 3223, and applied the three-part analysis both in that case and in *Aguilar.* Likewise, the Court agrees with a majority of the parties that recent Supreme Court opinions in the Free Exercise area reflect no dilution of the protections traditionally afforded to religious belief and practice under the First Amendment. *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985), for example, merely reaffirmed the principle that " '[t]he First Amendment ... gives no one the right to insist that in pursuit of their own interests *others* must conform their conduct to his own religious necessities.' " 105 S.Ct. at 2918 (quoting *Otten v. Baltimore & Ohio R. Co.*, 205 F.2d 58, 61 (2d Cir.1953)) (emphasis added).[28] It in no way undermined the "long line of [Supreme Court] precedents [holding] that the Government must accomodate a legitimate free exercise claim unless pursuing an especially important interest by narrowly tailored means." *Bow-*

27. *Wilder I* is not, technically speaking, the law of the case because *Wilder v. Sugarman,* the action to which the three-judge court's opinion pertained, was a separate action from *Wilder v. Bernstein,* the case now before this Court. *See supra* at 1297 & 1300–01.

28. In *Thornton,* the Supreme Court held that a Connecticut statute providing Sabbath observers with "an absolute and unqualified right not to work on their Sabbath" violated the Establishment Clause in that it "ha[d] a primary effect that impermissibly advance[d] a particular religious practice." 105 S.Ct. at 2918.

*en v. Roy, supra,* 106 S.Ct. at 2166 (O'Connor, J., concurring and dissenting in part).

Given that there has been no discernable change in First Amendment law that would invite reconsideration of the Establishment Clause and Free Exercise issues addressed facially in *Wilder I,* this Court must determine whether the changes in the New York City child care system that are proposed in the Stipulation now before the Court take that scheme out of the realm of "fair and reasonable accomodation" of the Religion Clauses held permissible in *Wilder I. See* 385 F.Supp. at 1029. If that is clearly the case, the Court must disapprove the settlement as violative of the Establishment Clause.

There is little question that New York City's child care system—both in its present form and as contemplated under the Stipulation—runs the risk of impermissibly advancing religion under the second part of the *Lemon* test as applied in *Wilder I* and, more recently, *Grand Rapids, supra.* Because many religious child care agencies are, by their own acknowledgment, "pervasively sectarian," there is a real possibility that their employees "may become involved in intentionally or inadvertently inculcating particular tenets or beliefs." *Grand Rapids, supra,* 105 S.Ct. at 3223. Further, SSC's routine placement of children in religiously affiliated agencies or programs "may provide a crucial symbolic link between government and religion, thereby enlisting—at least in the eyes of impressionable youngsters—the powers of government to the support of the religious denomination operating the [program]." *Id.* at 3223–24. Finally, the substantial expenditure of public funds on child care provided by religious agencies "may have the effect of directly promoting religion by impermissibly providing a subsidy to the primary religious mission of the institutions affected." *Id.* at 3224.[29]

These aspects of New York City's child care system admittedly raise serious problems under the Establishment Clause. However, they also clearly were taken into account by the three-judge court in *Wilder I,* which held them to be counterbalanced by the Free Exercise interests advanced through New York's reliance on sectarian agencies. *See* 385 F.Supp. at 1024 & 1029. The Stipulation presents no *greater* danger of impermissibly advancing religion than exists under the present system of foster care upheld on its face in *Wilder I.*[30] Assuming then that "countervailing" constitutional interests—comparable to those

---

**29.** The Establishment Clause problem created by substantial public funding of sectarian agencies would not be eliminated even if it were shown that virtually all of the government payments went to providing for such temporal needs of children as food, clothing and shelter. As the Supreme Court observed in discussing aid to nonpublic schools in *Grand Rapids,* "all aid to religious school ultimately 'flows to' the students.... Yet in *Meek [v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975)], we held unconstitutional the loan of instructional materials to religious schools and in *Wolman [v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977)], we rejected the fiction that a similar program could be saved by masking it as aid to individual students.... Where ... no meaningful distinction can be made between *aid to the student and aid to the school,* 'the concept of a loan to individuals is a transparent fiction.'" 105 S.Ct. at 3229 (quoting *Wolman, supra,* 433 U.S. at 264, 97 S.Ct. at 2614).

**30.** Arguably, the Stipulation *mitigates* many of the Establishment Clause defects implicit in New York's present child care system. The "religious practices" section of the settlement, for example, requires that "agencies ... follow policies and practices that ensure the free exercise rights of all children in placement...." (¶ 70) By requiring sectarian agencies to accomodate the needs of children from different religious backgrounds, and by prohibiting agencies from imposing their religious beliefs and practices on the children in their care—or penalizing children for not participating in religious activities sponsored by the agency—the Stipulation minimizes the extent to which agency employees "intentionally or inadvertently inculcat[e] particular religious tenets or beliefs" in children from other religious traditions or no religious tradition. *See Grand Rapids, supra,* 105 S.Ct. at 3223. In addition, the principle of "first-come, first-served" that permeates the Stipulation's placement provisions assures that the New York City system in *operation* conforms to one of the critical assumptions in *Wilder I,* that New York's child placement scheme is not being used "to favor one or more religion[s] over others or even to favor religion as against the absence of religion." 385 F.Supp. at 1028.

weighed in *Wilder I*—are furthered by the proposed scheme,[31] the concerns noted above would not in themselves require the Court to disapprove the proposed settlement.

The Stipulation presents a more complicated question on the issue of entanglement. All parties acknowledge that the settlement contemplates additional administrative or· monitoring functions to be performed by SSC, the settlement panel and, to some extent, the Court. It is necessary, therefore, to consider whether these anticipated activities clearly create an "excessive and enduring entanglement between state and church" under the third part of the *Lemon v. Kurtzman* test, *see* 403 U.S. at 619, 91 S.Ct. at 2114, and in light of the three-judge court's holding in *Wilder I.* It was, after all, the "pervasive monitoring by public authorities in the sectarian schools"· that doomed New York City's Title I program in *Aguilar* by creating an excessive entanglement of City and parochial school personnel. *See* 105 S.Ct. at 3238.[32]

As previously noted, the panel in *Wilder I* did not explicitly reach the entanglement issue, having found that the New York statutes in question violated the literal language of the Establishment Clause under the first two prongs of the *Lemon* test. The court did consider the problem of entanglement implicitly, however, in examining possible alternatives to New York's present scheme of relying on voluntary agencies and programs—many of them religiously affiliated—to provide publicly funded child care. The court concluded, it will be recalled, that if the State were required to provide for all children's religious needs

---

**31.** Plaintiffs have argued that the present characteristics of New York City's child care population substantially undercut the three-judge court's finding in *Wilder I* that, at least on their face, New York's religious matching statutes and related laws are "reasonably essential"· to protect the Free Exercise rights of children in foster care. *See* 385 F.Supp. at 1024 & 1029. Plaintiffs assert that only about twenty percent of New York City parents whose children are placed in foster care by SSC actually request a particular religious placement. *See* Michelson Report, *supra,* at 57; *see also* Plaintiffs' Third Memorandum in Support of Proposed Settlement ("Plaintiffs' Third Memorandum") at 13 n. 1. Plaintiffs maintain further that, "[s]ystemwide, approximately 50% of all children are placed out of religion." Plaintiffs' Third Memorandum at 21 n. 2.

These assertions, if proven correct, *would* undermine the argument that New York's system of matching children with foster care agencies of the same religion is *necessary* to protect the Free Exercise rights of *most* children in foster care. The proof would not, of course, dispose of the *Wilder I* court's practical concern for what "suitable or constructive alternative[s]" could be found "to fill the void that would be created if the state were to terminate foster care in religious institutions or homes." 385 F.Supp. at 1028. More importantly, plaintiffs' figures do not negate the possibility that "countervailing circumstances" may exist to justify the continuation of a child care system like New York's if the system is reasonably necessary to further the Free Exercise rights of a sizeable *minority* of children in foster care, as ·long as the system adequately protects the constitutional rights of *all* children in care.

The Stipulation, for example, assumes that the beliefs and practices of children from certain pervasively religious cultures can be protected adequately only in "specially designated" agencies that care only for children of those religions. (¶ 61). It is arguable that the religious exercises of other children—from "mainstream" Catholic and Jewish backgrounds, for example—are less pervasive but still sufficiently extensive that they can *best* be protected in a compatible (though not necessarily exclusive) religious environment. A parent's or child's expression of a preference for a particular religious placement would presumably reflect such a determination. As noted earlier, the Stipulation requires SSC to honor such religious preferences if they otherwise are in the children's best interest and do not deprive other children of suitable placements. The Stipulation also requires religious agencies to accomodate the religious needs of *all* children in their care at the same time that they provide a supportive environment for children of their particular religion.

**32.** Ironically, the "detailed monitoring and close administrative contact" that spelled the Title I program's demise resulted from New York City's "well-intentioned efforts" to "guard against the infiltration of religious thought" into the program itself. *See* 105 S.Ct. at 3239. Justice Rehnquist, dissenting in *Aguilar,* noted the "Catch-22" situation in which New York City was placed, "whereby aid must be supervised to ensure no entanglement but the supervision itself is held ·to cause· an entanglement." *Id.* at 3243.

through "strictly secular, non-religious home[s] or institution[s]," it would become "hopelessly entangled in religion, far beyond its existing simple relationship with foster parents and religious institutions, under which the latter assume all of these responsibilities for the child's religious education." 385 F.Supp. at 1028 & 1029. Implicit in the three-judge court's comparison was the assumption that there *is* entanglement in New York's present system of foster care—how could there not be, given the panel's previous findings of a religious purpose and pro-religious effects in the statutory scheme?—but that the entanglement is not excessive because of the State's countervailing constitutional obligation to provide for the religious needs of children in its care. The panel assumed that excessive entanglement of state and church *would* likely result if New York were directly responsible for the "custom-tailoring" of each child's religious training and observance. *See id.* at 1028–29. The validity of that assumption, of course, is beyond the scope of the Court's inquiry here.

Under *Wilder I,* then, it must be presumed that a degree of state-church entanglement is permissible and even necessary in the New York City foster care scheme if SSC is to provide in some fashion for the religious needs of the children in its care. This presumption in itself casts doubt on the direct relevance of *Aguilar* and the line of school funding cases that preceded it. In those cases, the Supreme Court almost invariably has found or assumed that the state's object in giving various forms of aid to nonpublic schools was entirely secular. *See, e.g., Witters v. Washington Dep't of Servs. for the Blind,* —— U.S. ——, 106 S.Ct. 748, 750, 88 L.Ed.2d 846 (1986); *Grand Rapids, supra,* 105 S.Ct. at 3223; *Meek v. Pittenger,* 421 U.S. at 349, 363, 95 S.Ct. 1753, 1762, 44 L.Ed.2d 217 (1975); *Lemon, supra,* 403 U.S. at 613, 91 S.Ct. at 2111. The Supreme Court has focused, therefore, on the second and third areas of inquiry under *Lemon v. Kurtzman:* the second, whether the aid program "poses a substantial risk of state-sponsored indoctrination," *Grand Rapids, supra,* 105 S.Ct. at

3225, or has the principal effect of symbolicly linking the state with certain religious denominations or of directly subsidizing sectarian enterprises; the third, whether to ensure that the aid program does *not* have the effect of inculcating or otherwise advancing religion, the state must engage in "comprehensive, discriminating, and continuing ... surveillance" of the program, thereby creating an "excessive and enduring entanglement between state and church," *Lemon, supra,* 403 U.S. at 619, 91 S.Ct. at 2114. Various distinctions have been drawn in the school aid cases, between schools and colleges, *see, e.g., Aguilar, supra,* 105 S.Ct. at 3237–38, between "incidental benefits" such as bus transportation and school lunches and "direct aid" in the form of tuition grants and "loans" of broadly defined "instructional materials," *e.g., Grand Rapids, supra,* 105 S.Ct. at 3228–29, and between aid in the form of "secular, neutral, or nonideological services, facilities, or materials" and teachers or counselors, *e.g., Lemon, supra,* 403 U.S. at 616–19, 91 S.Ct. at 2113–14. Common to all the school aid cases, however, is the assumption that if the state is to provide aid to sectarian schools, its assistance must remain free of any religious "infiltration" without necessitating an elaborate and intrusive surveillance mechanism to make sure that this is done.

Under *Wilder I,* however, it is assumed that some religious "infiltration" into publicly funded child care is inevitable if New York is to respect and facilitate the religious exercise of children in its care. The State therefore will necessarily be entangled to some extent with religious matters and religious institutions in order to meet its obligations under the Free Exercise Clause. However, the entanglement should differ from that found—and condemned—in the school aid cases in that its purpose would be to promote free exercise of religion among children in foster care rather than to prevent the intrusion of *any* religious influence into a publicly funded program. In the context of publicly funded foster care, therefore, it seems appropri-

ate to inquire, not simply whether the foster care program entails "detailed monitoring and close administrative contact" between public welfare officials and religious groups or agencies, *see Aguilar, supra,* 105 S.Ct. at 3239, but whether the degree of government involvement with religious concerns and religious organizations is reasonably necessary to protect the Free Exercise rights of the children in care.[33]

With this standard in mind, the Court turns to the settlement proposed in this case, and in particular to the terms of the Stipulation that the objecting defendants—Catholic and Jewish child care agencies—have challenged specifically on "entanglement" grounds. It goes without saying that the mere existence of government regulations or oversight mechanisms for private child care institutions—sectarian and nonsectarian—does not offend the Establishment Clause. Even in the context of state aid to nonpublic schools, the Supreme Court has recognized that "[s]ome relationship between government and religious organizations is inevitable." *Lemon, supra,* 403 U.S. at 614, 91 S.Ct. at 2112. Thus, "[f]ire inspections, building and zoning regulations, and state requirements under compulsory school-attendance laws are examples of necessary and permissible contracts." *Id.* In New York, for example, the state statutes governing school attendance—at nonpublic as well as public schools—specify not only the conditions of attendance and the length of school sessions, but required courses of study and competency of instructors. *See* N.Y. Educ.Law § 3204 (courses of instruction); §§ 3205–08, 3210 (attendance); *see also Paladino v. Adelphi University,* 89 A.D.2d

85, 90–91, 454 N.Y.S.2d 868, 872 (2d Dep't 1982).

New York's statutes governing public and private child care agencies—"authorized agencies" as defined in N.Y.Soc. Serv.Law § 371(10)—are far more extensive, encompassing not only certification and licensing requirements, *see, e.g.,* N.Y. Soc.Serv.Law §§ 374–b & c, 375–78, but authorizing periodic inspections of child care agencies by members of the State Department of Social Services or "employees of any incorporated society for the prevention of cruelty to children," *id.* § 386. These state statutes, and the substantial body of regulations that implement them, are not challenged in this litigation as impermissibly "entangling" under the Establishment Clause when applied to sectarian child care agencies and institutions. Indeed, the objecting defendants rely upon these existing statutes and regulations in advancing other legal objections to the proposed settlement. *See* Objectors' Brief at 44–46; *infra* at 1339. Nor is it suggested that recent legislative and administrative measures such as the Child Welfare Reform Act of 1979 ("CWRA"), N.Y.Soc. Serv.Law §§ 398–b, 409–409–h, and SSC's Program Assessment System ("PAS") have unconstitutionally entangled New York State and City agencies in the internal operation of religiously affiliated institutions.[34] Yet those regulatory measures undeniably have heightened government scrutiny over the child care provided by the voluntary agencies, and have caused the agencies to alter certain of their internal procedures and policies. *See infra* at 1343–44 & notes 38 & 39. The State and

---

**33.** This standard would take into account the disparate religious needs of children within a community and in different communities. Depending on the religious diversity of the child care population in a particular social service district, New York City for example, the responsible government agency might be required to develop one or several programs to meet children's needs for religious training and observance. Because of the concentration of many ethnic and religious groups in urban centers, it also would not be surprising to find that a more varied and elaborate religious program or

scheme of religious programs was necessary for a city child care agency than would be required, for example, in a rural community or social service district.

**34.** A number of the submissions addressing the child care concerns raised by the original settlement proposal criticize PAS and other aspects of SSC's administration of child care in New York City, *see infra* at notes 38 & 39; *see also infra* at 1351–52, but on clinical rather than constitutional grounds.

City clearly have a legitimate interest in ensuring the health and safety of children in foster care institutions, particularly those children in the State's official custody. When this important government interest is considered, there is ample justification for viewing New York's extensive regulation of child care agencies—sectarian as well as nonsectarian—as "necessary and permissible" for Establishment Clause purposes. *See Lemon, supra,* 403 U.S. at 614, 91 S.Ct. at 2112. At least so far as present state and city regulations are concerned, defendants do not dispute this proposition.

Against this background, the objecting defendants' broadside Establishment Clause attack on the administrative and monitoring provisions of the Stipulation appears itself, overbroad. The features of the proposed settlement that most closely approximate defendants' characterization of "extensive bureaucratic, state-controlled overlay"—in particular, the development of a classification system for child care agencies and programs (¶¶ 6–17), and the information gathering and monitoring tasks contemplated for the settlement panel (¶¶ 71–74)—have their counterparts in New York's existing foster care scheme. Since 1980, for example, SSC has employed PAS to evaluate agency performance. *See infra* at 1343–44 & note 38. Moreover, both the State and SSC already impose recordkeeping and reporting requirements on the agencies to monitor their compliance with various regulatory objectives. *See id.*

The objecting defendants argue that, from an Establishment Clause perspective at least, the present child care system strikes a "delicate balance between State and church." Objectors' Supplemental Brief at 3. If that is the case, then the mechanisms proposed in the Stipulation for administering and monitoring placements of children in New York City's foster care agencies do not appreciably "tip" that balance. For the most part, they replace or supplement SSC's existing placement procedures. Moreover, they do not raise the central "entanglement" concerns expressed in many of the cases.[35]

The objecting defendants raise more specific Establishment Clause challenges to the Stipulation, however. They take issue with what they characterize as the settlement's " 'benign[ ]' attempts to monitor all

---

**35.** Those concerns generally involve government's inspection of or inquiry into the religious beliefs, motives or practices of a sectarian institution. *See, e.g., Aguilar, supra,* 105 S.Ct. at 3239 ("In short, the religious school, which has as a primary purpose the advancement and preservation of a particular religion[,] must endure the ongoing presence of state personnel whose primary purpose is to monitor teachers and students *in an attempt to guard against the infiltration of religious thought.*"); *Lemon, supra,* 403 U.S. at 620, 91 S.Ct. at 2114, (Rhode Island's Salary Supplement Act, which authorized state officials to supplement salaries of teachers of secular subjects in nonpublic elementary schools, "require[d] the government [in certain circumstances] to examine the school's records in order to determine how much of the total expenditures [was] attributable to secular education and how much to religious activity. *This kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids.*"); *Culvert, supra,* 753 F.2d at 1168 ("[T]he First Amendment prohibits the [New York] State [Labor Relations] Board from *inquiring into an asserted religious motive* [*for discharging a lay employee* from a Catholic parochial school] to determine whether it is pre-

textual."); *Equal Employment Opportunity Comm'n v. Mississippi College,* 626 F.2d 477, 487 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981) ("The information requested by the EEOC's subpoena [directed to a Baptist college did] not clearly *implicate any religious practices of the College.* "); *Catholic Bishop of Chicago v. National Labor Rels. Bd.,* 559 F.2d 1112, 1125 (7th Cir.1977), *aff'd on other grounds,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) ("*We are unable to see how the Board can avoid becoming entangled in doctrinal matters* if, for example, an unfair labor practice charge followed the dismissal of a [Catholic parochial school] teacher either for teaching a doctrine that has current favor with the public at large but is totally at odds with the tenets of the Roman Catholic faith, or for adopting a lifestyle acceptable to some, but contrary to Catholic moral teachings.") (emphasis added). In contrast, the administrative and monitoring features of the Stipulation concern almost entirely SSC's procedures for placing children in foster care programs. Their focus, therefore, is on the therapeutic and other needs of children awaiting placement, and only tangentially on the religious orientation of the agencies in which children are placed.

aspects of religious life of agencies and children in foster care." Objectors' Supplemental Brief at 14. Examples of such religious monitoring, defendants argue, include the Stipulation's provisions with regard to parental preferences for a religious placement, the placement of children in accordance with such expressed preferences, SSC's determination of "specially designated" agencies to care for children from pervasive religious backgrounds, and the religious practices of children in the care of voluntary agencies. *See id.* at 11.

It can scarcely be disputed these aspects of the Stipulation entangle SSC and SSC personnel in matters of religion, and with religious agencies on issues affecting their beliefs and practices. Absent countervailing Free Exercise interests and obligations, such involvement with religious concerns and the religious aspects of sectarian institutions clearly would create an impermissible entanglement of state and church.[36] However, as the Court held above in examining the Free Exercise objections of the religious agencies, *each* of the settlement provisions identified here is intended to protect or facilitate the religious exercise of children in foster care. *See supra* at 1326–29. Under the First Amendment analysis suggested by the three-judge court's holding in *Wilder I*, it remains to be determined whether the terms of the Stipulation that defendants challenge are reasonably necessary to protect the countervailing Free Exercise interests of children in the foster care system.

The Court has examined the challenged provisions, and cannot say that they are either unreasonable or unnecessary means of facilitating the religious exercise of children in foster care. In general, the religion-oriented terms of the Stipulation clarify the role of religion in SSC placement decisions and provide uniform guidelines for accomodating the religious needs of all children placed in foster care agencies. More specifically, the religious preference and placement provisions identify the role of religion in foster care placements in a manner fully consistent with the New York Court of Appeals' interpretation of New York's religious matching statutes in *In re Dickens, supra.* Furthermore, the provision governing "specially designated" agencies articulates a standard fully consistent with the Supreme Court's language in *Yoder, supra,* for identifying children and groups of children with unique child care needs under the Free Exercise Clause. Finally, the religious practices provisions assure that not only children in "in-religion" placements, but *all* children in New York City child care, will benefit from the "countervailing" Free Exercise interests that the court in *Wilder I* held gave validity to an otherwise unconstitutional foster care scheme.

The Establishment Clause clearly raises the foremost legal objection to the settlement proposal. In this area, then, it is particularly important that the Court not attempt to resolve unsettled legal questions in passing on the legality of the Stipulation. *See Robertson, supra,* 556 F.2d at 686; *see also Armstrong v. Board of School Dirs. of Milwaukee,* 616 F.2d 305, 319–22 (7th Cir.1980). Under the "reasonably necessary" standard suggested by the three-judge court's analysis in *Wilder I,* it cannot be said that the settlement clearly violates the Establishment Clause. The terms of the Stipulation that are most susceptible to attack under the Establishment Clause are, at the same time, designed to further the Free Exercise rights of some or all New York City children in foster care. The settlement does not clearly take New York City's child care system outside the

---

**36.** In *Aguilar, supra,* for example, the Supreme Court noted the invasive aspect of one requirement of the Title I program at issue there, that any parochial school classroom being used for Title I purposes must be purged of all "religious symbol[s]." 105 S.Ct. at 3239. Here, this Court expressed initial misgivings about part of ¶ 70(9) of the Stipulation, which bars the display

of "excessive religious symbols" by sectarian agencies. *See supra* at 1329. As the Court observed above, its approval of that provision is conditioned on the term's enforceability only in circumstances where, it can be argued, a particular religious symbol has a chilling effect on the Free Exercise rights of children in an agency's care.

realm of "fair and reasonable accomoda-
tion" of the Religion Clauses validated in
*Wilder I.* This Court therefore will not
withhold approval of the Stipulation on un-
settled Establishment Clause grounds.

### H. *Other Legal Objections*

The objecting defendants' remaining le-
gal challenges to the Stipulation, based on
various federal and state statutes, require
little comment. Defendants have not dem-
onstrated how implementation of the pro-
posed settlement would jeopardize New
York's receipt of federal monies under Title
IV–A of the Social Security Act, as amend-
ed, 42 U.S.C. § 601 *et seq. See* Objectors'
Brief at 49–50. Similarly, defendants have
not shown how ¶ 76 of the Stipulation, gov-
erning the confidentiality of client-identifia-
ble information that may be provided to the
settlement panel or plaintiffs' counsel for
purposes of monitoring compliance with the
terms of the settlement, clearly violates
New York or federal laws relevant to the
confidentiality of information regarding
children in foster care. *See* 42 U.S.C.
§ 671(a)(8); N.Y.Soc.Serv.Law § 372(4).
This paragraph, in fact, was substantially
modified to meet the legal objection of the
State defendants to the confidentiality pro-
vision of the original settlement proposal.
*See infra* at 1349–50. As already indicated,
the State defendants have withdrawn that
and their other legal objections to the Stip-
ulation as revised.

The objecting defendants catalog the nu-
merous state statutes and regulations gov-
erning foster care in New York. Objec-
tors' Brief at 44–46. They do not indicate,
however, how the settlement proposal con-
flicts with the State's existing foster care
scheme. Even now, SSC administers the
placement of children in New York City
foster care programs under its own body of
distinct but presumably consistent regula-
tions and procedures. Moreover, it was
apparant at several points in the settlement
negotiations that took place in the fall of
1984 that the participants were attempting
to *avoid* any conflict with the State's child
care statutes and regulations, particularly
those regarding the religious matching of
children with sectarian agencies. It bears
repeating that the State defendants, who
presumably are the parties most familiar
with the intricacies of New York's existing
foster care scheme, raise no legal objec-
tions to the Stipulation in its present form.

■ Finally, the objecting defendants
argue that the Stipulation violates the fed-
eral Anti-Injunction Statute, 28 U.S.C.
§ 2283, because it threatens to create inter-
ference and conflict with the Family
Court's periodic review of individual place-
ments of children in foster care. *See* N.Y.
Soc.Serv.Law § 392. As a preliminary
matter, the Court notes that the Stipulation
poses no clear violation of § 2283. It is
well settled that the statute, which pre-
cludes federal courts from staying state
court proceedings "except as expressly au-
thorized by Act of Congress, or where nec-
essary in aid of its jurisdiction, or to pro-
tect or effectuate its judgments," applies
only to injunctions against *pending* state
court proceedings. 17 Wright, Miller &
Cooper § 4251 at 534. The Stipulation, if
approved and given force as a consent de-
cree of this Court, would not enjoin or
otherwise interfere with any pending Fami-
ly Court proceedings.[37]

Nor does the Court perceive a necessary
or even likely conflict between the adminis-
trative and monitoring activities contem-
plated under the Stipulation and the deci-
sions of Family Court judges respecting
the appropriateness of continuing a child's
placement in foster care under N.Y.Soc.
Serv.Law § 392. The Stipulation—like the
lawsuit from which it emerges—addresses
general procedures and practices involved
in *SSC's* placement of children with private
foster care agencies. There is nothing in
the language of the proposed settlement,

---

**37.** For the same reason, and because the class's
claims here of constitutional violations would
perforce be beyond the scope of the Family
Court foster care review proceedings about
which defendants express concern, the absten-
tion doctrine of *Younger v. Harris,* 401 U.S. 37,
91 S.Ct. 746, 27 L.Ed.2d 669 (1971), also does
not apply. *See Hawaii Housing Auth. v. Midkiff,*
467 U.S. 229, 237–39, 104 S.Ct. 2321, 2327–28, 81
L.Ed.2d 186 (1984).

nor in the history of settlement negotiations of which this Court is aware, to suggest that the Stipulation is intended to interfere in any way with individual Family Court proceedings regarding abuse and neglect, custody, foster care placement, or adoption. Moreover, the focus of the § 392 foster care review hearings to which defendants make specific reference appears entirely beyond the scope of this litigation and, therefore, the proposed settlement. Section 392(5–a) and the Practice Commentary accompanying the statute section indicate that the Family Court judge's concern in periodically reviewing a child's placement in foster care is to ascertain whether it is appropriate to return the child to its natural parent(s) or whether action should be taken to free the child for adoption. There is no reason to anticipate that implementation of the proposed settlement would interfere in any way with such Family Court inquiries.

## II. *Fairness, Reasonableness and Adequacy*

■ As noted earlier, the nature of the proposed class action settlement—in particular, the institutional changes it would make in the delivery of foster care services to New York City children and the supervisory role contemplated for the Court in implementing those changes—requires the Court to consider not only the fairness of the Stipulation to the plaintiff class, but also its likely impact on the objecting defendant agencies, on the City's child care system, and on the public at large. The Court will examine these ingredients of the fairness calculus in turn.

### A. *Fairness to Plaintiff Class*

■ Earlier in this discussion, the Court summarized the standard developed in this Circuit for judging the fairness of class action settlements. The purpose of that inquiry, it will be recalled, is to assure that the rights of absent class members are not prejudiced by a hasty or lopsided settlement that benefits primarily the named plaintiffs or class counsel. *See supra* at 1309. To that end, a court must examine both the terms of the settlement as compared to the likely result at trial, and the competence, vigor and independence of counsel in negotiating the terms of the settlement. *See Malchman, supra,* 706 F.2d at 433.

■ With regard to the latter area of inquiry, it cannot fairly be argued—and, in fact, no party even raises the issue—that counsel's representation of the plaintiff class in negotiating the terms of the Stipulation has been anything but competent and vigorous. Although the original settlement proposal was negotiated initially between plaintiffs' counsel and the City defendants, nothing in the record even faintly suggests that the original settlement or the present Stipulation was the product of coercion or collusion. Indeed, plaintiffs' counsel's spirited resistance to various modifications of the settlement proposed during negotiations in late 1984 confirms the independence as well as effectiveness with which plaintiffs' counsel has advocated the interests of the plaintiff class throughout this litigation.

Turning to the fairness of the Stipulation's substantive terms to class members, the Court notes the relevance of several of the factors outlined in *City of Detroit v. Grinnell Corp., supra.* They include the complexity, expense and likely duration of the litigation; the reaction of class members to the settlement; the stage of the proceedings and amount of discovery completed; the risks of maintaining the class action through trial and of proving liability at trial; the ability of the settling defendants to withstand a greater judgment (or, here, to comply with a more costly or disruptive remedy); the reasonableness of the settlement when compared to the *best possible* recovery for the class; and the reasonableness of the compromise in comparison to plaintiffs' *likely* recovery after a trial on the merits. *See Grinnell, supra,* 495 F.2d at 463. Under these factors the Court has little difficulty in concluding that the terms of the Stipulation are eminently fair to the class of black Protestant chil-

dren in need of foster care in New York City.

Certainly, if time were the salient factor in determining the reasonableness of a class action settlement, the Stipulation scrutinized here would be profoundly *un*reasonable. The many months devoted to negotiation of both the original and revised settlement, to briefing and argument on the legal objections to the Stipulation, to the selection of the "qualified and impartial person" identified in ¶ 35, to circulation of the Stipulation among the boards of directors of the various intervening agencies for approval, and finally to examination by this Court, far outstrip the several weeks that a trial likely would have absorbed. Such a comparison is misleading, of course, for it does not take into account the time that would have been required after trial, assuming liability were found on some or all of plaintiffs' claims, for the Court to fashion its own remedy, possibly with the aid of a court-appointed special master or special advisory panel.

Other factors, however, point more definitively to the fairness of the settlement. Clearly, the instant class action is fraught with complexity, involving as it does the delicate interplay of constitutional principles, state statutes and regulations, public and private agency administration, and the varied and critical needs of children in foster care. The negotiations that ultimately produced the settlement now before the Court began on the eve of trial in 1983, after there had been some ten years of discovery and several amendments of the pleadings to take account of changes and refinements in the parties' factual and legal contentions. By late 1983, then, plaintiffs were in as good a position as they could be to gauge the strengths and weaknesses of their various claims for relief.

Over ten years of discovery, plaintiffs had accumulated a substantial amount of evidence relevant to their claims of racial and religious discrimination. *See* Plaintiffs' Second Memorandum at 14–21. Plaintiffs' counsel concede that the claim of religious discrimination would have been the easier claim to prove. *See id.* at 26–27. Much of plaintiffs' strongest deposition testimony on the religious discrimination claim, however, appears to date back to the mid–1970s. *See, e.g., id.* at 15–16. Live testimony today by the same individuals or those in comparable positions might well paint a different picture of the intake preferences and practices of New York City's religious agencies. Plaintiffs likewise had accumulated evidence in support of both their Free Exercise and Establishment Clause claims. Nonetheless, it could not easily be predicted how evidence bearing on the actual operation of the New York City child care system might affect this Court's determination of the validity *vel non* of *Wilder I* and the assumptions underlying that decision. Although there is little doubt that the class action could have been maintained through trial, plaintiffs could not be *assured* of establishing liability on all, or even most, of their claims.

For plaintiffs evaluating their case in 1983, the risks associated with obtaining a particular type of remedy were even more substantial. Assuming they succeeded at trial in demonstrating that New York City's present child care system is constitutionally defective, it was not—nor is it now—clear what alternative system could realistically be developed to replace the City's existing reliance on religiously affiliated agencies. Moreover, plaintiffs could anticipate that the Court's ability to unilaterally orchestrate a substantial restructuring of the New York system would be hampered, both by its lack of expertise in the areas of institutional child care and public agency administration, and by the Eleventh Amendment, which would bar the Court from committing the State to provide additional funding for new Direct Care facilities or other costly changes in the system. *See Pennhurst State School and Hospital v. Halderman, supra,* 465 U.S. at 101–02 & n. 11, 104 S.Ct. at 908–09 & n. 11. On the eve of trial, then, it was far from clear what plaintiffs' *optimal* recovery would be (a system of city-run agencies and programs? a scheme founded on SSC contracts with entirely secular, voluntary

agencies? a hybrid of the two?), let alone what plaintiffs were *likely* to recover given the uncertainty of establishing liability and the constitutional and other restraints on the Court's power to fashion an appropriate remedy.

The Stipulation, like all settlements, embodies a number of critical compromises by the parties. The most signficant of these, from plaintiffs' point of view, is the City's continued ability under the settlement to provide foster care through its contracts with sectarian agencies. The Stipulation provides, however, for important changes in SSC's placement procedures that should drastically curtail if not eliminate any racial or religious discrimination that exists under the present system. In addition, the "religious practices" section of the Stipulation provides safeguards for the benefit of class members who are placed in sectarian agencies, both against differential treatment by agency personnel because of the children's religion (or lack of religious belief), and against interference with their religious practices and beliefs. Furthermore, the changes proposed for the foster care system under the Stipulation do not resolve plaintiffs' underlying constitutional claims at the expense of sound child care principles. *See infra* at 1349–51. Nor has any class member objected to the settlement on fairness or other grounds. Viewing the terms of the Stipulation—both its compromises and its appreciable benefits to the plaintiff class—against the uncertainties of proving liability and obtaining a meaningful remedy after trial, the Court concludes that the Stipulation is a fair, reasonable and adequate settlement of the plaintiff class's claims.

### B. *Effect on Objecting Agencies*

There are three principal areas in which, the objecting defendants argue, the proposed settlement prejudices them: first, in negotiating future contracts with SSC; second, in fulfilling their missions to care for children of their own religions; and third, in providing effective services to the children in their care. The third area of concern is discussed fully in the section that follows. The Court focuses on the first two areas here.

#### 1. *Contract Negotiations with SSC*

The objecting defendants have maintained, throughout the course of settlement negotiations, that the City was using this forum to extract contract concessions from the voluntary agencies that it had heretofore been unable to obtain through "ordinary arm's-length negotiation[s]." Objectors' Brief at 65. The agencies' concerns were most evident in discussions involving possible modifications of ¶ 22 of the Stipulation (¶ 14 of the original settlement proposal). As originally drafted, the paragraph provided in part that "SSC shall have the final authority over all placement decisions." This provision, the agencies argued, would effectively prevent them from exercising any professional judgment in accepting or rejecting the children referred to them by SSC. (The City had argued that SSC must retain final authority over the placement of children in its custody because it remains ultimately responsible for their welfare.) As revised, ¶ 22 states in part that, *"[s]ubject to the terms of this Stipulation,* SSC shall have final *administrative* authority over all placement decisions and shall refer all children for placement in accordance with the terms of this Stipulation"* (emphasis added). The underlined additions to the paragraph appear to have allayed the concerns of the intervening agencies, though not necessarily those of the objecting agency defendants. Among the terms of the Stipulation to which SSC's final *administrative* authority would be subject is ¶ 35, which provides that disputes involving agencies' therapeutic objections to SSC placement decisions are to be referred to a "qualified and impartial person" paid by SSC.

The above example should illustrate both the delicacy with which certain terms of the Stipulation were negotiated and modified by the parties, and the extent to which those terms necessarily impinge on aspects of SSC's working relationship with the voluntary agencies. The Court is aware that various "hidden agendas" may have

prompted parties to adopt certain positions in the course of this litigation and, more particularly, in the negotiation of the Stipulation. Furthermore, the Court recognizes that the relationship between SSC and the voluntary child care agencies is essentially one of contract. It seems inevitable, therefore, that any settlement of this lawsuit—involving as it does the legality of the entire New York City child care system—would in some way affect the contractual relationship between SSC and the voluntary agencies with which it does business. Nonetheless, this is not a contract action. The voluntary agencies presumably retain remedies under state law to redress specific claims they may have against SSC arising out of their existing or future contracts with that agency. The focus of the Court's inquiry here must be to determine whether the Stipulation's indirect effect on the contractual relationship between SSC and the voluntary agencies is sufficiently unfair to warrant disapproval of the settlement, notwithstanding the Court's conclusion above that the settlement is fair to members of the plaintiff class.

▇▇▇▇ The Court plainly could not approve the Stipulation if it authorized or required clearly illegal conduct by SSC or the participating child care agencies. *Robertson, supra*, 556 F.2d at 686. Similarly, the Stipulation could not be approved over the objection of most of the defendant agencies if it altered specific contractual rights of the agencies that the City or SSC could not otherwise abridge, for example, by ordinance or new agency regulations. *See Kirkland, supra*, 711 F.2d at 1126–28. The Court already has established, however, that neither of these circumstances is present here. *See supra* at 1318. There remains the question of whether the terms of the proposed settlement frustrate some legitimate expectation of the agencies in their ability to continue to do business with the City as before. The objecting defendants maintain that they have derived such an expectation from their past dealings with SSC. (H.T. 1058–59) *See also* Objectors' Brief at 60 & 64. Although the content of this "expectation" is not entirely

clear, defendants presumably would argue that it is violated by such aspects of the Stipulation as the development of a classification system for use in placing children in foster care programs, the placement of children on a first-come, first-served basis, the limitations placed on agencies' refusals to accept children referred by SSC, and the establishment of system-wide standards for meeting the religious needs of children in foster care. The defendant agencies' resistance to systemic changes such as those proposed in the Stipulation is understandable. Nevertheless, defendants do not persuade the Court that they have a legitimate expectation of maintaining the *status quo* in their dealings with the City and SSC.

Institutional changes invariably cause some degree of uncertainty and disruption. It should not be surprising, then, that administrators and child care professionals in New York City's voluntary agencies have continued to contract with SSC in recent years, hoping that they could continue to operate as they have in the past. Any *expectation* that they could do so, however, seems neither realistic nor legitimate in view of the significant changes that have occurred in the nature and regulation of New York City foster care over only the last decade. All parties acknowledge the demographic changes that have taken place in the City's child care population, which now services older children with more severe behavioral and emotional problems, and many more minority children, than before. *See, e.g.,* Affidavit of Gail M. Kong, Deputy Admin. of SSC, at ¶ 13 (sworn to July 5, 1984); Affidavit of Jerome M. Goldsmith, Exec. Vice Pres. of Jewish Board of Family and Children's Services, at ¶ 57 (sworn to July 20, 1984); Affidavit of Edward Gordon, M.D., Chairman of Committee of Psychiatrists of Voluntary Child Care Agencies, at ¶¶ 7–8 (sworn to July 25, 1984). There is similarly no dispute that recent state legislation, notably the CWRA, and SSC's implementation of agency review procedures under PAS, have significantly altered the respective priorities of the New York State Department of Social Services

and SSC,[38] and have forced voluntary agencies receiving public funds to modify their reporting procedures and other practices as well.[39]

Notwithstanding the desire of voluntary agencies to maintain the *status quo*, it is evident that they have already been forced to respond both to changes in the characteristics of children in foster care and to increased regulation by both the State and City. Moreover, it is not apparent that the agencies derive much security from their existing contracts with SSC. It is undisputed that those contracts typically are of one year's duration and are renegotiated at the end of the contract period. Further, it is averred that SSC has terminated its relationship with some agencies (or taken other remedial measures) even before the end of the contract term where the agencies had received unsatisfactory ratings under PAS. *See* Affidavit of John Courtney, Dir. of Office of Program Assessment, SSC, at ¶¶ 28–35 (sworn to July 6, 1984). Finally, it cannot be ignored that the *Wilder* litigation

itself represents a contingency with which the voluntary agencies (as well as the State and City defendants) have had to deal over the past thirteen years. Challenging as it does the very constitutionality of New York City's child care system, the lawsuit has always had as one of its objectives a radical reshaping of New York City's foster care scheme. The voluntary agencies have continued to accept public funding for child care services even under *Wilder's* shadow.

 Under all of these circumstances, the objecting agencies have not established that they have a legitimate expectation either of dealing entirely at "arm's-length" with SSC, or of continuing to contract with SSC under the same terms as they have in the past. The prospect of changes in the content and character of future contract negotiations between SSC and the agencies, as an indirect result of the proposed settlement, therefore does not provide a ground for disapproving the Stipulation.

**38.** The CWRA has been described as a response to "the public's perception that change within the foster care system was too slow in coming and in response to numerous studies of New York City's foster care system which revealed that too many children were in foster care and that they were remaining in care for too long a period of time." Kong Affidavit at ¶ 21. The legislation, therefore, was enacted with two goals: "1) to prevent a child's entry into foster care through the provision of preventive services to the child and his family and 2) to achieve *permanency* in the lives of foster children by mandating procedures and substantial reporting requirements designed to ensure the child's return home as soon as possible or, failing that, the child's speedy adoption." *Id.* (emphasis in original). SSC officials justify PAS similarly, as the City agency's "response to the well-documented fact that long-term foster care was undesirable and that every effort had to be made to prevent children's unnecessary entry into foster care and to ensure that foster children were returned home as soon as possible." *Id.* at ¶ 23. PAS's asserted objectives, therefore, are to monitor agencies' compliance with state foster care regulations, *id.* at ¶ 25, and to set standards for "key outcomes" such as adoption, *id.* at ¶ 26.
It should be noted that the voluntary agencies' perspectives on both the CWRA and PAS are significantly different. Virtually all agencies that have taken part in this litigation decry the

additional paperwork that must be generated to comply with the state statute and state and SSC regulations. *See, e.g.,* Memorandum of Non-Defendant Agencies in Support of Objections to Proposed Stipulation of Settlement ("Intervenors' Memorandum") at 11–13 (citing affidavits of agency administrators and clinicians). Moreover, the agencies maintain that PAS, for example, does not measure (and therefore does not reward) the *quality* of child care services provided by the agencies, but only the *speed* with which agencies place children *out* of the child care system either by returning them to their original homes or arranging for adoptions. *See id.* at 13–15. The priority placed on time in foster care, agencies argue, often works against the best interest of a troubled child in need of long-term treatment or simply a stable, supportive environment. *Id.* at 14–15.

**39.** Among the most disturbing submissions this Court has reviewed relevant to the proposed settlement are the affidavits of several trained social workers who, they aver, left the employment of voluntary child care agencies in New York City because they felt the burden of meeting paperwork requirements under state and SSC regulations prevented them from performing their function as child care clinicians. *See, e.g.,* Affidavits of Joel Beck (sworn to May 2, 1984); Janet E. Cavanagh (sworn to May 1, 1984); Paul Farhi (sworn to April 17, 1984); and Laura Kam (sworn to April 22, 1984); *see also* Intervenors' Memorandum at 11–13.

## 2. *Religious Mission*

The objecting agencies also express concern that, under the terms of the Stipulation, they will no longer be able to fulfill their charitable missions of caring for children of their own religious affiliations. They express fear that, as a result, their funding from private sources may dwindle and thereby threaten the solvency of their entire operations. The Court is not insensitive to these concerns, nor to the sincerely held beliefs of the dedicated professionals who provide foster care to New York City children under religious auspices. Defendants' concerns, however, rest on unproven assumptions about the placement patterns that are likely to emerge under the system contemplated in the Stipulation. It is not at all clear that the objecting agencies—Catholic and Jewish in affiliation—would *not* continue to care for a large proportion of the New York City children in need of foster care who are, respectively, Catholic or Jewish. Certainly the deference accorded under the Stipulation to parental requests for particular religious placements operates against such a result. *See also infra* at 1351–52.

In addition, the Catholic and Jewish agencies cannot deny that their charitable missions have changed in recent years in response to demographic changes in the child care population. They are the first to point out the substantial numbers of children *not* of their religion for whom they now care. *See, e.g.,* Supplemental Submission by Certain Objectors at 3 (summary of 1985 statistics on religious affiliation of children in Catholic foster care agencies); *see also* Goldsmith Affidavit at ¶ 45. Nor can it be ignored that these religiously affiliated agencies fulfill their charitable missions today with sizeable infusions of public funds. Establishment Clause problems associated with this aside, *supra* at

1329–39, the objecting defendants (and their private contributors) must recognize that the role of a publicly funded agency is different from that of a private religious institution. Indeed, the Jewish and Catholic defendant agencies describe themselves for purposes of this lawsuit, *not* in terms of their religious affiliation and religious mission, but by emphasizing their clinical expertise in caring for children with particular behavioral or other characteristics, and the specialized programs they have developed to meet such children's needs.[40] In view of the speculative nature of defendants' concerns about being able to continue their religious missions, and the broad roles they have already assumed in developing publicly funded programs to address the needs of troubled children from all religious backgrounds, the Court does not view the concerns discussed here as a sufficient ground for disapproving the proposed settlement.

### C. *Impact on Foster Care System as a Whole*

In response to the original settlement proposed by plaintiffs and the City defendants, the Court reviewed numerous submissions relevant to the fairness and adequacy of the settlement from a clinical perspective. These included affidavits and letters from psychiatrists and psychiatric associations, professors of social work, child care agency administrators and consultants, and present and past SSC officials. The vast majority of child care professionals who commented on the original settlement expressed misgivings about its likely effect on the quality of foster care provided to New York City children. The comments varied, but certain themes predominated: that *all* New York City children should receive quality foster care regardless of race or religion, but that any settlement designed to achieve that end must not sac-

---

**40.** *See, e.g.,* Affidavits of Richard Berman, Pres. of Jewish Child Care Ass'n (sworn to July 18, 1984); Jerome M. Goldsmith, Exec. Vice Pres. of Jewish Board of Family and Children's Services (sworn to July 20, 1984); Sister Paulette LoMonaco, Exec. Dir. of Good Shepherd Services (sworn to July 20, 1984); Sister Anne E.

Schneiders, Exec. Dir. of The Astor Home for Children (sworn to July 18, 1984); Sister Cecilia Schneider, Exec. Dir. of The New York Foundling Hospital (sworn to July 19, 1984); and Sister Marie Bernadette Wyman, Exec. Dir. of Mission of the Immaculate Virgin (sworn to July 20, 1984).

rifice individualized evaluation and treatment by qualified, knowledgeable professionals; that SSC's adherence to a rigid system of agency classifications and "first-come, first-served" placement procedures would have the effect of treating children as fungible goods to be categorized and warehoused; that the crucial task of evaluating children and determining the appropriateness of their placement in a particular program should not be removed entirely from the agency clinicians who are most familiar with an agency's resources and the dynamics of the group(s) of children already in care; and that if SSC is to assume a greater role than it has in the past in making preliminary evaluations and placement decisions, it must hire and/or train additional caseworkers to perform these expanded duties in a clinically responsible manner. The original settlement proposal was variously described by the commentators as "a policy/planner document," Statement of Judith M. Mishne at ¶ 15 (dated July 19, 1984), "a carefully designed blueprint for a great leap into the past," Letter of Sydney Koret, Ph.D., at 1 (dated July 19, 1984), and "a blunt instrument" threatening to destroy the "delicate ecological system[s]" of quality foster care programs, Statement of Donald J. Cohen, M.D., at ¶¶ 18 & 9 (dated July 20, 1984).

Among the most forceful and articulate critics of the original settlement were the administrators and consultants associated with the nineteen voluntary agencies that intervened in the action for the purpose of airing their objections to the settlement. *See supra* at 1303. As the intervenors attested, they "[had] no axes to grind." Supplemental Memorandum of Non-Defendant Agencies ("Intervenors' Supplemental Memorandum") at 3. Their expressed purpose was to measure the settlement proposal against the "sole standard" they considered relevant—whether it furthered the best interests of children in foster care. *See id.* The Intervenors' original comments proved extremely valuable to the Court, not only because they offered a fresh perspective on the day-to-day operation of New York City's child care system

from the agency clinician's point of view, *see, e.g.,* Intervenors' Memorandum at 4–15, but because their criticism of the original settlement proposal was concrete, comprehensive and constructive.

The Intervenors' clinical objections to the original settlement included the following:

1. that the feasibility of classifying agencies and programs by quality of care was uncertain;

2. that the hiring of a consultant to develop such a classification system would divert scarce funds from necessary child care activities;

3. that the settlement furnished no standards by which to measure the qualifications of applicants for the position of "consultant";

4. that the settlement uniformly excluded the nondefendant agencies from meaningful participation in decisions directly affecting their operation and the child care system generally;

5. that the settlement assumed the continued use of PAS as a measure of the quality of care delivered by the voluntary agencies;

6. that by providing that SSC would have final authority over all placement decisions, the settlement interfered with the "informal consultation process by which SSC and the agencies [presently] pool information to seek the most appropriate placements of children." Objections of Non-Defendant Agencies to Proposed Stipulation of Settlement ("Intervenors' Objections") at ¶ 18;

7. that the settlement's "first-come, first-served" provisions would "in effect randomize placement and treat all children as fungible in total disregard of clinical considerations, including the depth and relative urgency of need." *Id.* at ¶ 20;

8. that the permissible grounds for refusing placement of a child in a foster boarding home setting were inexplicably narrower than those that applied to placement in congregate care facilities;

9. that the additional reporting and recordkeeping required under the settlement would only divert additional resources from essential child care and make the agencies' recruitment of qualified personnel even more difficult;

10. that the provisions regarding vacancies in agency programs would have the effect of needlessly keeping vacancies open while placement disputes were being worked out, and of penalizing agencies and children for computer errors on the agencies' vacancy lists;

11. that the settlement draft did not specify the forum in which agencies could air their therapeutic objections to SSC placement decisions;

12. that the definition of "emergency placements" as only those that must be made within twenty-four hours was too narrow, failing to take account of weekends, availability of relatives and friends, *et cetera;*

13. that the provisions regarding the avoidance of unnecessary transfers of children from one program to another were inexplicably narrower for foster boarding home, than for congregate care, placements;

14. that the provision requiring all agency "walk-ins" (children or parents who appear at an agency's door in apparent need of placement) to be referred to SSC would "subject[ ] distressed families to a bureaucratic shuffle and impose[ ] the unacceptable risk that many will abandon the effort to get the help they need." *Id.* at ¶ 28;

15. that the waiting lists for agency programs contemplated under the settlement would force some children to wait indefinitely for a placement and, where there is a combined list, would fail to make distinctions between the needs of different children and families;

16. that the thirty days allotted for SSC to make preliminary evaluations of children was unrealistic given SSC's past performance in making even simpler assessments of children for placement;

17. that the SSC evaluation procedures contemplated in the settlement would improperly restrict agencies' access to information about children awaiting placement, and did not provide for independent evaluations to be done by agencies where appropriate or necessary;

18. that the funding for a settlement panel and staff would divert additional resources away from necessary child care services;

19. that the settlement panel's access to client records could compromise the confidentiality of both the records and the professional-client relationship;

20. and that the settlement alluded to an "attached" stipulation of confidentiality, but did not in fact include it.

*See generally* Intervenors' Objections at ¶¶ 11–41. Elsewhere, the intervenors and others took exception to the fact that the terms of the proposed settlement applied to all voluntary agencies contracting with SSC, but not explicitly to SSC's own Direct Care programs.

The settlement originally presented to the Court in April 1984, and with some modification in August of the same year, was clearly problematic. Both the State defendants and religious agency defendants opposed it on numerous legal grounds. Moreover, it had met with widespread disapproval from child care experts both within and outside the New York City foster care system. The clinical concerns voiced by the intervenors and others raised serious questions in the Court's mind about both the extent to which child care issues had fully been explored by the original drafters of the settlement, and the extent to which the voluntary agencies had been allowed to participate meaningfully in the initial negotiations. The original settlement proposal therefore was unacceptable on several levels.

By the August 6, 1984 hearing, however, the intervenors had reached agreement on certain general topics that theretofore had been subjects of dispute. In view of the responsiveness of the City defendants and plaintiffs' counsel to at least some of their

criticisms and suggestions, the intervenors offered to engage in a new round of negotiations to resolve the remaining problems they ·perceived in the settlement proposal. Their purpose, as they then articulated it, was "to craft a document that can affirmatively serve as a guideline to an improvement of child care services in the City of New York." Intervenors' Supplemental Memorandum at 2. To that end, the intervenors suggested specific changes that could be made in the original settlement draft to cure or mitigate the problems they had identified in their original objections. *See id.* at 10–22; *see also* Affidavit of Wayne R. Mucci, Exec. Dir. of Sheltering Arms Children's Service, at ¶¶ 10–24 (sworn to July 27, 1984). It was around these concrete proposals that all the parties subsequently negotiated, in open court, during lengthy sessions held through the fall of 1984.

The general outlines of the Stipulation now before the Court do not differ greatly from those of the original settlement. The Stipulation continues key elements of the original proposal, including the development of a classification system (or alternative evaluation of quality) for child care programs, the placement of children in foster care programs under the general principle of "first-come, first-served," the recognition (where appropriate and practicable) of a parent's expressed wish for a particular religious placement, the performing of initial evaluations and placement of children by SSC, the establishment of agency procedures for facilitating the religious practices of all children in an agency's care, and the monitoring of compliance with the settlement and specific outcomes by a settlement panel. Within this broad outline, however, the Stipulation reflects numerous changes—some minor, some substantial—that address virtually all of the concerns raised by the intervenors and other child care administrators and clinicians who commented on the original settlement proposal. Among the noteworthy modifications of the settlement draft are the following:

1. The Stipulation identifies areas of expertise to be considered in evaluating candidates for the position of consultant(s), and outlines in detail the process for nominating and selecting such individual(s). The process provides for SSC's selection of the consultant(s) after all interested parties have had an opportunity to comment on the selection criteria and to suggest names for consideration, and after representatives of the City, plaintiffs, intervenors, defendant agencies and nonparty signatories ·of the Stipulation have designated qualified candidates and interviewed them. (¶ 6)

2. The consultant(s) have discretion under the Stipulation to develop a classification system *or* alternative means of evaluating the quality of agency programs (including the City's Direct Care programs), and to make any other recommendations concerning the improvement of the foster care system after considering the views of all interested parties. (¶¶ 7–10, 13, 16) The Stipulation provides for the resolution of disputes among the signatories regarding the evaluation system proposed and its implementation. (¶¶ 8, 10–11, 14–15) Foster care agencies retain their existing remedies for challenging the category or rating assigned to them under the system. (¶¶ 12, 17)

3. The placement principle of "first-come, first-served" is modified in several respects. The Stipulation recognizes exceptions to the general placement rule for "compelling therapeutic reasons, including but not limited to emergencies and waiting lists." (¶ 21) Emergency placements are no longer limited to those that must be made within twenty-four hours, but are provided for within the broader category of "pre-evaluation placements." (¶ 37) Compelling therapeutic reasons to depart from the "first-come, first-served" principle are also contemplated in the "rare and extraordinary" cases where particular religious beliefs ·and practices pervade a child's life. (¶ 21)

4. SSC's control of the evaluation and placement process is modified to account for the expertise of agency clinicians, their familiarity with an agency's program and with the children already in

care, and their responsibility for the consequences of any placement decision. As noted earlier, SSC retains final *administrative* authority over placement decisions, subject to other terms of the Stipulation. (¶ 22) Those "other terms" authorize agencies to obtain additional information about children being considered for placement and, if appropriate, to conduct their own evaluations of a child prior to placement. (¶¶ 49–51) The Stipulation further provides that disputes between SSC and the agencies concerning the additional information or evaluations permitted by SSC, and concerning therapeutic objections to SSC placement decisions, are to be referred to "a qualified and impartial person paid by SSC." (¶¶ 35, 49)

5. Unrealistic or clinically troublesome aspects of the original settlement's provisions on waiting lists and vacancies are addressed. Children's placement on waiting lists for particular agencies or programs are now subject to the broader treatment of emergencies and other therapeutic exceptions under ¶ 21. (¶¶ 44, 46) Agencies must report only the vacancies available for New York City children, and may elect to report trial discharges or suspended payments as vacancies. Agencies may accept or reject children based on vacancies that do not appear on SSC's master list if they can demonstrate that the list inaccurately reflects actual vacancies in the programs involved. (¶ 54) Where an agency objects on therapeutic grounds to a particular placement, it must keep open the vacancy involved for a a maximum of ten days, during which SSC must rule on the objection. (¶¶ 34–35)

6. Inconsistencies noted between the provisions governing foster boarding homes and congregate care facilities are corrected. *See, e.g.,* ¶¶ 26, 39.

7. The provision regarding agency "walk-ins" is liberalized to accomodate

emergencies and other circumstances in which requiring the parent(s) or child to be referred to an SSC field office would be detrimental or unnecessary. (¶ 41)

8. The Stipulation provides at several points for greater participation by both signatory and nonsignatory agencies in the implementation of its terms. *See, e.g.,* ¶¶ 6, 7, 8, 9, 12, 13, 14, 15, 17, 22, 26, 34, 35, 41, 42, 44, 49, 50, 51, 71, 73(4), 82.

9. The Stipulation memorializes an agreement between the State and City to jointly review existing paperwork requirements. The City specifically commits itself to retain an advisor within ninety days after entry of the Stipulation to recommend measures to be taken by both State and City to reduce the paperwork burden on all participants in the New York City child care system. (¶ 62)

10. As stated earlier, modifications of the confidentiality provisions of the Stipulation resolve the clear legal objections raised initially by the State defendants and objecting agency defendants. *See supra* at 1339. Specifically, the Stipulation now provides for the redacting or coding of client-identifiable information by agencies or SSC; the executing of a separate stipulation of confidentiality by all persons having access to client-identifiable information under the terms of the settlement; giving of notice to the New York State Department of Social Services and the relevant agency before any client-identifiable information is provided to either plaintiffs' counsel or the settlement panel; and the prohibition against further disclosure of such information without court order. (¶ 76) In addition to meeting the legal objections raised to the confidentiality provision in the original settlement, these restrictions on disclosure should allay the clinical concerns expressed by child care professionals about the risks posed to client confidences by the terms of the original settlement.[41]

---

**41.** Paragraph 76(a) provides that a "Stipulation of Confidentiality" is attached as "Exhibit One" to the Stipulation. No such document is appended to the signed Stipulation now before the Court, nor has one been provided separately.

The proponents, therefore, will be required to submit a copy of the proposed confidentiality stipulation before the Court gives final approval to the settlement.

■ It bears restating at this point that the Court's task in examining the proposed settlement for its fairness, reasonableness and adequacy is not to determine whether the compromise achieved is a perfect solution to the problems presented, nor whether it comports exactly with the remedy this Court likely would have imposed after trial. Rather, the Court must be assured that the settlement represents a fair resolution of the parties' claims and that it does not detrimentally affect the rights and legitimate interests of third parties and the general public. It goes without saying that this Court could not approve the Stipulation if it posed a substantial threat either to the economic viability of New York City's foster care system or to the quality of foster care now provided to New York City children. With certain reservations identified below, the Court concludes that the Stipulation poses no substantial threat to the viability of New York City's foster care system, and indeed presents opportunities to improve the system for the benefit of all participants.

■ As noted earlier, the intervenors, who joined the lawsuit for the sole purpose of objecting to the Stipulation on clinical grounds, and who offered by far the most comprehensive criticisms of the original settlement proposal from the perspective of child care professionals, not only have withdrawn their clinical objections to the settlement, but have voluntarily consented to be bound by its terms as signatories to the agreement. The intervenors' ultimate assent to the Stipulation as revised is certainly not determinative of the fairness question before the Court. Nonetheless, their radical change of position as a result of the modifications made in the Stipulation weighs significantly in the Court's evaluation. The intervening agencies, as nonparties vis-a-vis the underlying constitutional claims in the lawsuit, are the sole participants in this litigation who have been in a position to address freely and undistractedly the child care concerns that were prompted by the original settlement proposal. At the same time, their direct participation in the New York City foster care system, and their ongoing contact with the children in care, give them the ability and incentive to comment authoritatively on the likely impact of the settlement on agency administrators and clinicians and on the children they serve. The Court benefited immeasurably from the intervenors' initial insights into the operation of the child care system from the voluntary agency's perspective. The drafters of the original settlement undeniably benefited from the intervenors' constructive criticism and suggestions. Under all the circumstances, the Court considers the intervenors' assent to the Stipulation strongly indicative of its fairness to the child care system as a whole.

When asked to articulate their fairness objections to the revised settlement at the hearing on March 4, 1985, the objecting defendants stated that their position remained essentially unchanged from that articulated at the first hearing held in August 1984. Defendants acknowledged that they had participated in the settlement negotiations held through the fall of 1984, and that the settlement draft had been modified in several respects in response to their objections, as well as those expressed by the intervenors and the State defendants. (H.T. 894–96) Nonetheless, the objecting defendants restated their belief that the settlement as a whole is illegal and not in the best interest of children. (H.T. 894) One spokesperson for the defendant agencies conceded, however, that the defendants' fairness concerns could not easily be separated from their legal objections to the Stipulation, in particular those based upon the Free Exercise Clause and New York's religious matching statutes. (H.T. 899–900)

The Court has reviewed in detail the objections originally made by the defendant agencies to the first settlement proposal. To the extent defendants' clinical or child care concerns may be separated from their legal objections to the settlement, they vary little from the comprehensive criticisms offered at the same time by the intervenors. With the exception of the areas discussed below, the Court is satisfied that the changes made in the settlement in response to those criticisms either resolve

or adequately address the agencies' underlying child care concerns so as to cure any fundamental unfairness latent in the original settlement proposal. This is not to say that the Stipulation represents, in the Court's eyes, the perfect or ideal solution to the problems presented in this lawsuit. The settlement is unquestionably the product of human endeavor and compromise. At the same time, the Stipulation substantially achieves several critical and interrelated goals: it reconciles competing constitutional and statutory interests implicit in New York City's existing foster care scheme, and does so without sacrificing either the historically significant contribution of voluntary agencies to the child care system or the professional expertise and judgment of administrators and clinicians in the agencies.

In addition, the Stipulation offers several opportunities to actually improve the operation of New York City's child care system. The consultant(s) charged with developing a classification system or other means of evaluating the quality of agency programs are authorized to make recommendations for improving any and all aspects of the foster care scheme that arise out of their review of the existing system. (¶ 9(e)) Further, the commitment of the State and City memorialized in the Stipulation, to review existing paperwork requirements with a view to reducing the paperwork burden on all participants in the child care system, represents an important step in checking one of the unfortunate side-effects of increased government regulation in the foster care field. (¶ 62) Finally, the settlement panel's review of data on the placement of children under the Stipulation provides an additional opportunity for qualified observers to criticize and make recommendations for improvements in the delivery of foster care to New York City children. (¶ 73)

The availability of the settlement panel to monitor placements and assess their effect on the quality of child care provided also mitigates one of the outstanding therapeutic concerns raised by both the intervenors and defendant agencies. Some of the child care experts who commented on the original settlement proposal—both for and against its approval—noted the potential for psychological damage to children of a particular racial, ethnic or religious background when they are placed in an "alien" environment that forces them to assimilate into the dominant culture rather than identify with their own racial or cultural group. *See, e.g.,* Cohen Statement at ¶¶ 12–13; Declaration of James P. Comer at ¶ 6 (dated July 3, 1984); Affidavit of Ord Matek at ¶¶ 7–11 (sworn to July 19, 1984). The intervenors and objecting defendants consider these observations particularly relevant to Jewish children, who represent a small fraction of New York City's child care population.[42] Under a placement system of "first-come, first-served," they suggest, Jewish children could conceivably be scattered throughout the various agencies and programs, and would suffer a loss of cultural identity and support as a result. (H.T. 901–07)

The real or potential problems of Jewish children and other minority groups in New York City's foster care population deserve serious attention. The concerns expressed by the agencies about the likely effect of the Stipulation on such groups, however, is entirely speculative. It assumes, in the case of Jewish children, that all Jewish parents actually request placements in Jewish-affiliated agencies or programs, and that their expressed wishes are given no effect by SSC, contrary to the clear intent and provisions of the Stipulation. *See, e.g.,* ¶¶ 23, 24, 28, 30. The agencies' hypothesis is not even plausible unless, in addition to assuming that all Jewish parents request placement in a Jewish agency, one assumes further that all Jewish agencies rank uniformly high in the evaluation system devised by the consultant(s), and that they all offer programs that are appropriate to large numbers of children needing placements. Then, presumably, waiting lists could develop for places in the Jewish pro-

---

**42.** Counsel for the intervenors estimated at the March 4, 1985 hearing that Jewish children represent approximately three percent of the foster care population, or about 500 children out of 17,000. (H.T. 902) Their approximation is not disputed by any other parties to the litigation.

grams. Assuming further that there was little movement out of the programs in question (as children returned home or were placed for adoption), it is possible that a Jewish child on a waiting list for a vacancy in a Jewish program might be placed at least in the short term in a non-Jewish agency.

Most if not all of the assumptions stated above have yet to be proven or even substantiated. The speculative concerns expressed about the possible impact of a "first-come, first-served" placement system on Jewish children therefore would not provide cause in themselves to disapprove the Stipulation. Nonetheless, they highlight a potentially fruitful area for the settlement panel's review and recommendation. It has been pointed out that the New York City child care population includes many minority groups that, in all likelihood, are scattered even now throughout the City's foster care system. Systematic review of placement data pertaining to these minority children may identify problems commonly experienced by such children in foster care, and may further suggest placement practices or other steps that can be taken to minimize the children's difficulties. Were the settlement panel to uncover systemic problems experienced by minority children under the settlement, the Stipulation provides a mechanism for modifying the agreement to address those problems. (¶ 77)

There remains one area of concern that is critical to the fairness of the proposed settlement to the New York City child care system in general, but that is not adequately addressed by the terms of the Stipulation itself. That is SSC's capability, both financial and staffing-related, to support its additional responsibilities under the proposed settlement. City officials themselves have acknowledged SSC's "mistakes and shortfalls" in meeting its responsibilities in the past. See Affidavit of Stanley Brezenoff, Deputy Mayor for Operations, at ¶ 7 (sworn to July 6, 1984); Kong Affidavit at ¶ 4. The observations of psychiatrists and social workers familiar with New York City's foster care system are more pointed. One generalizes that "[i]n my experience SSC staff are ... undertrained, overworked, overburdened and undersupervised." Mishne Statement at ¶ 7; see also Gordon Affidavit at ¶ 12; Affidavit of Joseph D. Noshpitz, M.D., at ¶ 13 (sworn to July 20, 1984). A former Assistant Commissioner of SSC and Commissioner of the State Department of Social Services avers that, based on her past experience with the former agency, she does not believe SSC has the present capacity to effectively carry out its proposed duties under the Stipulation. See Affidavit of Barbara B. Blum at ¶ 6 (sworn to July 19, 1984). Proponents of the Stipulation themselves emphasize the importance of adequate funding and staffing by qualified caseworkers if SSC is to meet its additional responsibilities under the settlement.[43]

The dissatisfaction of voluntary agencies with SSC's past performance in evaluating and placing children in foster care programs would not in itself move this Court to disapprove the proposed settlement. Given the volume of placements caseworkers process yearly, many of them on an emergency basis,[44] some mistakes must be

---

**43.** See, e.g., Affidavit of Eve Block Brooks, Exec. Dir. of Statewide Youth Advocacy, at ¶ 6 (sworn to July, 1984); Affidavit of Eric Brettschneider at ¶ 14 (sworn to June 28, 1984); Declaration of William T. Green, Pres. of Ass'n of Black Social Workers, Inc., at ¶ 9 (dated June 29, 1984); Declaration of Vera S. Paster at ¶ 5 (dated June 25, 1984); Declaration of Norris P. Phillips at ¶ 10 (dated May 31, 1984); Declaration of Robert L. Polk at ¶ 9 (dated May 25, 1984); Declaration of Theodore J. Stein, Prof. of Social Work, N.Y.U. School of Social Work, at ¶ 9 (dated June 18, 1984); Affidavit of Miriam Thompson at ¶ 9 (sworn to June 4, 1984); see also Letter of James R. Dumpson, Chair of Foster Care Monitoring Committee, at 3–4 (dated May 23, 1984).

**44.** One SSC official avers that in 1983, for example, the agency authorized 11,665 placements of children in New York City foster care programs. Affidavit of Harry Silverstein, Admin. Dir. of Div. of Admin. and Placement, Office of Placement and Accountability, SSC, at ¶ 6 (sworn to July 6, 1984). There is no dispute that a substantial number of SSC's placements typically involve some sort of emergency (within the generally accepted meaning of the term, not necessarily the meaning ascribed to it in the Stipulation).

expected. Moreover, SSC, as part of the New York City Human Resources Administration, remains statutorily responsible for the custody and welfare of children in publicly funded foster care, and would continue to evaluate and place children pursuant to that responsibility whether or not the Stipulation were approved. *See* N.Y.Soc. Serv.Law § 395. At the same time, the Court cannot ignore the expanded role that the proposed settlement contemplates for SSC in the critical areas of evaluation and placement. Nor can the Court disregard the substantial public expenditure implied in the Stipulation's provisions for "consultant(s)" to develop an agency evaluation system (¶ 6), a "qualified and impartial person" to rule on SSC-agency disputes regarding evaluations and placements (¶ 35), an "advisor" to recommend reductions in paperwork (¶ 62), and a settlement panel employing a full-time assistant and additional staff persons (¶ 71), *all* to be paid by SSC.

Particularly in view of SSC's past difficulties in fulfilling its responsibilities, and the staffing pressures under which it now operates, it would be an undeniable abuse of discretion for this Court to authorize implementation of the elaborate settlement proposed here without adequate assurances that the City has the financial resources available to fund the various consulting and monitoring positions contemplated in the Stipulation, as well as to hire the additional qualified caseworkers, supervisors and/or staff clinicians necessary to perform the evaluation and placement tasks outlined in the settlement. The Court's approval of the Stipulation, therefore, is conditioned on the City defendants' submission of affidavits and/or other appropriate materials documenting SSC's additional hiring goals and anticipated expenditures associated with implementing the Stipulation, and providing assurances that the additional funds necessary to implement the Stipulation can be obtained from sources outside of the present SSC budget.

### D. *Furtherance of Public Objectives*

A final inquiry relevant to the general fairness and appropriateness of the settlement proposal is whether it advances the objectives of the constitutional provisions and statutes on which the underlying lawsuit is based. *See Cleveland Firefighters, supra,* 106 S.Ct. at 3076; *Citizens for a Better Environment, supra,* 718 F.2d at 1125 & 1128; *City of Miami, supra,* 664 F.2d at 441. In the instant case, the legal bases of the action include both Religion Clauses of the First Amendment, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and Title VI of the Civil Rights Act of 1964. Taken together, the legal objectives of plaintiffs' outstanding claims are several: to undo any impermissible entanglement of state and church in the funding and operation of New York City's child care system; to protect the religious exercise of black Protestant children in New York City foster care; and to eradicate discrimination against those children either on the basis of race or religion by government officials and the voluntary child care agencies receiving federal as well as state and city funds.

Given the multiplicity of goals underlying this lawsuit, it is not surprising that the settlement negotiated by the parties represents a compromise or accommodation of their respective objectives. Thus, for example, the continuation of SSC's contractual relationship with sectarian child care agencies reflects a moderation of plaintiffs' Establishment Clause claims in furtherance of other of their goals, chiefly the elimination of racial and religious discrimination against black Protestant children within New York City's existing foster care system, and the protection of those children's Free Exercise rights while in the care of religiously affiliated agencies. At the same time, the parties to the settlement have attempted to accomodate the constitutional and statutory interests of the plaintiff class with those of other children in foster care whose parents wish their children's religious training and observance to be continued under the auspices of an agency of the same religious affiliation.

As the earlier discussion of legal objections to the Stipulation makes clear, any resolution of the conflicting constitutional interests of children in New York City fos-

ter care requires some degree of accommodation by all groups involved. The Court already has determined that the compromise reached in the Stipulation does not clearly violate any of the constitutional rights implicated in New York City's foster care scheme. The Court concludes further here that the settlement represents a fair accommodation of the conflicting interests at stake in the City's child care system. In short, the compromise achieved advances the plaintiff class's broad constitutional and statutory objectives without violating the constitutional rights and therapeutic needs of other children in New York City foster care.

## CONCLUSION

The Court has reviewed the numerous submissions of the parties and interested nonparties relevant to the legality and fairness of the proposed settlement of this litigation. Subject to the conditions identified below, the Court concludes that the Stipulation is legal, that it fairly resolves the plaintiff class's claims without prejudicing the legitimate interests of other participants in the New York City foster care system, and that it furthers the legal objectives of the underlying lawsuit. Accordingly, the Court approves the Stipulation pursuant to Rule 23(e), Fed.R.Civ.P., on the following conditions:

1. that plaintiffs' counsel submit affidavits of at least one named class representative and at least three unnamed class members (by themselves or their next best friends), attesting to the continued existence of a live dispute among the parties and to their interest in pursuing the litigation (including the implementation of the Stipulation);

2. that counsel for the signatories communicate in writing with the Court their agreement to the interpretation set forth above of ¶¶ 70(9) and 75 of the Stipulation;

3. that counsel for the signatories submit a copy of the "Stipulation of Confidentiality" referred to in ¶ 76(a) of the Stipulation; and

4. that the City defendants substantiate by affidavit and/or other appropriate documentation their intention and ability to commit resources outside of SSC's present budget to fund the additional consulting and monitoring positions authorized under the Stipulation and to hire the additional trained caseworkers, supervisors, and/or staff clinicians required to successfully implement the settlement's terms.

All submissions relevant to the above conditions shall be served and filed within thirty days of the date of this Opinion and Order, or by such later date as the Court may hereafter direct. Upon receipt of satisfactory submissions relevant to the conditions set forth above, the Court will direct settlement of a final judgment on notice to all parties.

It is so ordered.